Robert E. LYNCH, Fred Hoffman and
Phyllis Klein, Appellants,

v.

John R. TORQUATO, Edna Lugar and
Virgil Moraca.

No. 14911.

United States Court of Appeals
Third Circuit.

Argued Dec. 17, 1964.

Decided April 2, 1965.

W. Louis Coppersmith, Margolis, Coppersmith & Shahade, Johnstown, Pa., for appellants.

Walter A. Criste, Cresson, Pa., for appellee.

Before McLAUGHLIN, STALEY and HASTIE, Circuit Judges.

HASTIE, Circuit Judge.

This appeal has been taken from an order dismissing a complaint in which registered Democrats in Cambria County, Pennsylvania have challenged the present method of selecting a party County Chairman as denying them the equal protection of the laws guaranteed by the Fourteenth Amendment.

The Pennsylvania election code provides for the government of the local affairs of a political party within a county by a County Committee "elected at the spring primary, or appointed, as the rules of the * * * part[y] within the county may provide", and rulemaking power is expressly conferred upon the County Committee. 25 P.S. § 2837. The rules of the Democratic Party in Cambria County are alleged to call for the election of a Committeeman and a Committeewoman for each election dis-

trict[1] within the county by the party members residing therein, and provide that the persons so elected shall constitute the County Committee. By statute, an election district is constituted by "each borough and township, not divided into wards, and each ward of every city, borough and township * * * unless divided into two or more election districts" containing "between six hundred (600) and eight hundred (800) registered electors as nearly as may be", and the Court of Quarter Sessions of a county is authorized to administer this requirement by creating new election districts and changing the boundaries of existing ones. 25 P.S. §§ 2701–02. The rules adopted by the Cambria County Democratic Committee allegedly provide that a County Chairman and a Vice Chairman shall be elected by the Committee biennially at its organization meeting.

Beyond administering the party organization, the County Committee or its designee may, in certain extraordinary situations, select party nominees for elective public office. Such candidates are normally nominated at an open primary election, as required by state law. 25 P.S. §§ 2831 and 2862. However, in case the death or withdrawal of a person nominated by such a primary causes a vacancy in a party nomination, the duly constituted local governing body of the party may authorize an agency of the party to make a substitute nomination. 25 P.S. § 2939. The plaintiffs aver that in Cambria County this function is in fact performed by the County Chairman and an executive committee of his own choosing. However, it is clear that under the election code the ultimate authority in such matters is vested in the governing County Committee.

It is further alleged in the complaint that the several precincts of Cambria County have widely disparate numbers of registered Democrats. The complaint sets out the extreme examples of one precinct with 750 registered Democratic voters as contrasted with another containing only 18 registered Democratic voters. In these circumstances, the present system of electing the County party leadership by precinct unit voting is said to deprive party members of equal protection of the laws, and the remedy sought is a court order requiring the popular election of the County Chairman.

Gray v. Sanders, 1963, 372 U.S. 368, 83 S.Ct. 801, 9 L.Ed.2d 821, strikes down, as a denial of equal protection of the laws, a county unit scheme of voting in primary elections, as used in Georgia for choosing party nominees for state-wide executive and legislative offices. Under this scheme the relative voting strength assigned to the several Georgia counties was greatly disproportionate to the distribution of population among the counties.

For present purposes we may assume that the same principle would control a precinct unit scheme of voting to choose party nominees for county-wide executive and legislative office.[2] This would mean that the method of choosing nominees for such governmental offices as county commissioner and county representative in the state legislature would have to satisfy the same Fourteenth Amendment requirements as does the choice of nominees for Governor or United States Senator. State ex rel. Sonneborn v. Sylvester, 1965, 26 Wis.2d 43, 132 N.W.2d 249; see also Bianchi v. Griffing, E.D.N.Y.1963, 217 F.Supp. 166.

However, the contention of the plaintiffs is that the umbrella of the equal protection clause covers an even wider area. For the matter in controversy here is the choice not of county officers, but of a Democratic County Committee and a

1. In Cambria County the election districts are called precincts.

2. In passing, we observe that it is not alleged here that the precincts of Cambria County vary greatly in population.

The complaint asserts that it is constitutionally objectionable that equal voting strength in the choice of party leaders is accorded to precincts which contain greatly differing numbers of registered Democrats.

Democratic County Chairman, the party functionaries empowered to administer the local affairs of the Democratic party.

The normal and ordinary responsibilities of such local party leaders are familiar. They administer a miscellany of party business. They may be responsible for raising and spending money in the party interest. They may plan and direct local political campaigns as well as continuing efforts to win new party adherents and to encourage voter registration between campaigns. They may administer political patronage.[3]

But the citizen's constitutional right to equality as an elector, as declared in the relevant Supreme Court decisions,[4] applies to the choice of those who shall be his elected representatives in the conduct of government, not in the internal management of a political party. It is true that this right extends to state regulated and party conducted primaries. However, this is because the function of primaries is to select nominees for governmental office even though, not because, they are party enterprises. The people, when engaged in primary and general elections for the selection of their representatives in their government, may rationally be viewed as the "state" in action, with the consequence that the organization and regulation of these enterprises must be such as accord each elector equal protection of the laws. In contrast, the normal role of party leaders in conducting internal affairs of their party, other than primary or general elections, does not make their party offices governmental offices or the filling of these offices state action which must satisfy the requirements of Gray v. Sanders.

However, this is not the end of the matter. In addition to duties of the type already discussed, the party chairman in Cambria County is alleged to be the person who in fact exercises the party's power of choosing a substitute party nominee when a nomination for county-wide governmental office becomes vacant as a result of the death or disqualification of a party nominee between primary time and election time. It is arguable that, in making such emergency selection of a substitute nominee, a party leader is exercising a constitutionally protected function of the electorate and, therefore, that he can constitutionally do so only if he himself has been chosen by a process which respects the "one man one vote" principle. Whether the equalitarian requirement of the Fourteenth Amendment extends to procedural alternatives of primary elections,[5] and particularly to such post-primary emergency nominations as we have here, may well be doubted. But we need not and do not decide these questions. For even if it should be unconstitutional for party leaders chosen in an undemocratic manner to make emergency designations of party nominees for governmental office, it does not follow that these party leaders are constitutionally disqualified from performing their many and varied normal functions of administering the party business. A party chairman may perform these functions throughout his term of office without ever having occasion to select a substitute nominee for governmental office.

If the plaintiffs' theory of the application of the equal protection concept to emergency nominations is sound, it might arguably support a proceeding to restrain undemocratically chosen county of-

---

3. Much of the opinion of the District Court is devoted to a reminiscent discussion of these ordinary functions of a party chairman.

4. E.g. Reynolds v. Sims, 1964, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506; Wesberry v. Sanders, 1964, 376 U.S. 1, 84 S.Ct. 526, 11 L.Ed.2d 481; Gray v. Sanders, 1963, 372 U.S. 368, 83 S.Ct. 801.

5. The question at what stage popular choice must rule in the process of selecting public officials is a difficult one with far reaching implications. Indeed, choice of delegates to party national conventions for the nomination of candidates for President and Vice President would seem logically to be covered by the plaintiffs' view of the reach of the equal protection clause.

ficers from making such nominations. But that is not this case. Rather, the complaint is a general challenge to the right of a person who has not been selected in accordance with the one man one vote principle to serve as party County Chairman. The nature of the office and its normal responsibilities make this claim much too broad for constitutional validity.

In our view the only relief to which the plaintiffs might have an arguable constitutional claim would be an order restraining a County Chairman chosen in an undemocratic way from making party nominations for elective public offices. But it is not alleged that the County Chairman has made any such nomination or that the unusual situation has arisen in which he is authorized to do so. Thus, neither a violation of the plaintiffs' rights as voters nor the imminent prospect of such a violation appears in this case. Indeed, this lawsuit appears to be an effort of dissidents to wrest control of ordinary party affairs from present leadership rather than an attempt to vindicate the plaintiffs' right to share equitably in the choice of nominees for public office in some emergency situation which may never arise. Thus, an anticipatory solution of a possible future controversy of constitutional dimensions is urged upon us as a justification for judicial intervention in a present controversy which involves no actual or imminently threatened violation of constitutional rights.

■ In these circumstances, this is very clearly a proper case for judicial abstention from constitutional decision pursuant to the wholesome and authoritatively accepted principle that "federal judicial power is to be exercised to strike down legislation * * * only at the instance of one who is himself immediately harmed, or immediately threatened with harm, by the challenged action". Frankfurter, J., in Poe v. Ullman, 1961, 367 U.S. 497, 504, 81 S.Ct. 1752, 1756, 6 L.Ed.2d 989. Justice Harlan's dissenting opinion in Poe v. Ullman also recognized that before adjudicating the con-

stitutionality of state action a federal court "should insist that litigants bring to the Court interests and rights which require present recognition and controversies demanding immediate resolution". 367 U.S. at 525, 81 S.Ct. at 1767. The Court divided in Poe v. Ullman on the question whether there appeared a sufficient threat of enforcement of the Connecticut birth control laws against the plaintiffs to give the controversies "the immediacy which is an indispensible condition of constitutional adjudication". 367 U.S. at 508, 81 S.Ct. at 1758.

Similarly, in United Public Workers of America, CIO v. Mitchell, 1947, 330 U.S. 75, 67 S.Ct. 556, 91 L.Ed. 754, the Supreme Court decided that a federal court should not adjudicate the constitutionality of the Hatch Act on petition of public employees who had not engaged in such political activity as the statute prohibits. The Court reasoned that the "power of courts * * * to pass upon the constitutionality of acts of Congress arises only when the interests of litigants require the use of this judicial authority for their protection against actual interference. A hypothetical threat is not enough. * * *" 330 U.S. at 89, 67 S.Ct. at 564.

■ In some cases the facts lead to conflicting opinions on the application of the agreed general principle. But we experience no such difficulty here. As we have pointed out, the plaintiffs allege no present threat of any violation of their asserted right to participate equally with others in the selection of party candidates for public office. On the basis of their complaint, their constitutional rights are simply not in jeopardy.

We respect the sound doctrine which disapproves the anticipation of constitutional questions by affirming the dismissal of this action without expressing any opinion upon the validity of the presently authorized method of making emergency nominations for county office in Cambria County. The plaintiffs' claim to equality with other electors in making emergency nominations can be considered in a proceeding challenging the authority

of the County Chairman to make such a nomination, as distinguished from his right to hold party office, instituted when the plaintiffs' alleged rights are jeopardized by the making of such a nomination or its imminence.

The judgment dismissing the present complaint will be affirmed.