

2003 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

3-19-2003

# USA v. Murphy

Precedential or Non-Precedential: Precedential

Docket 01-3757

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2003

Recommended Citation

"USA v. Murphy" (2003). *2003 Decisions.* Paper 682.
http://digitalcommons.law.villanova.edu/thirdcircuit_2003/682

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2003 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

Filed March 19, 2003

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 01-3757

UNITED STATES OF AMERICA

v.

PETER A. MURPHY, *Appellant*

On Appeal From the United States District Court
For the District of New Jersey
(D.C. Crim. No. 00-cr-00778)
District Judge: Honorable Garrett E. Brown, Jr.

Argued: September 18, 2002

Before: BECKER, *Chief Judge*, SCIRICA and
MCKEE, *Circuit Judges.*

(Filed: March 19, 2003)

LAWRENCE S. LUSTBERG,
 ESQUIRE (ARGUED)
KEVIN MCNULTY, ESQUIRE
Gibbons, Del Deo, Dolan, Griffinger
 & Vecchione
One Riverfront Plaza
Newark, NJ 07102

*Counsel for Appellant*

CHRISTOPHER J. CHRISTIE,
 ESQUIRE
United States Attorney
GEORGE S. LEONE, ESQUIRE
 (ARGUED)
Chief, Appeals Division
Office of the United States Attorney
970 Broad Street, Room 700
Newark, NJ 07102

*Counsel for Appellee*

---

**OPINION OF THE COURT**

---

BECKER, *Chief Judge*:

This is an appeal by Peter A. Murphy following a jury trial in which he was convicted on three counts of violating the Travel Act, 18 U.S.C. § 1952 (the predicate offense being bribery under New Jersey law, N.J.S.A. 2C:27-2), and three counts of mail fraud, 18 U.S.C. §§ 1341 and 1346. Murphy is the former Chairman of the Republican Party in Passaic County, New Jersey ("the County"). The charged conduct concerned a contracts-for-payments scheme that Murphy allegedly organized by using his considerable influence over Passaic County officials to procure contracts for Central Medical Services, Inc. ("CMSI"). According to the Government's case, CMSI would then siphon off a certain amount of funds received from the County contracts to a panel of four individuals chosen by Murphy who performed no useful services in return for the payment.

In its prosecution of the mail fraud charge, the Government pursued three alternative theories of criminal liability. The first theory alleged that Murphy defrauded Passaic County of money and property. The second theory accused him of participating in a scheme to defraud the County of the honest services of its County Administrator, who was involved in the bribery scheme. The Government's third theory charged Murphy with depriving the County of its right to Murphy's own honest services in the affairs of the County.

This last theory relied on the decision of the Court of Appeals for the Second Circuit in *United States v. Margiotta*, 688 F.2d 108 (2d Cir. 1982), which sustained the conviction of a county chairman under similar circumstances. *Margiotta* was decided over a strong dissent by Judge Ralph K. Winter, who opined that the Court had impermissibly allowed the jury to determine whether a private party official involved himself so much in the government that he acquired a fiduciary duty to its citizens, and that such an inquiry was not based on any legal duties articulated in federal or state law. The Government's *Margiotta* theory was that Murphy had attained such a dominant role in the political system of Passaic County that he could be considered the equivalent of a publicly elected official, and that Murphy had a fiduciary duty to the County and its citizens to provide honest services which he breached by not informing County officials about the fraudulent nature of the contracts-for-payments scheme.

The District Court permitted the Government to proceed under *Margiotta*, and charged the jury accordingly. Murphy contends that this court should not endorse the *Margiotta* rationale because it is an overreaching interpretation of the mail fraud statute. We agree and conclude, in accord with Judge Winter, that *Margiotta* extends the mail fraud statute beyond any reasonable bounds. In our recent decisions interpreting honest services fraud, we emphasized the need to establish a violation of state law in such cases to serve as a limiting principle on the federal prosecution of local political actors. *See United States v. Panarella*, 277 F.3d 678, 693 (3d Cir. 2002); *United States v. Antico*, 275 F.3d 245, 262 n.18 (3d Cir. 2001). Although the Government suggests that Murphy's violation of the New Jersey Bribery Act, N.J.S.A. 2C:27-2, which was the predicate offense in the Travel Act charges, could serve as the state law source of a fiduciary obligation, we are not persuaded by this argument. The Bribery Act does not create a fiduciary relationship between Murphy and the public, just as no other criminal statute creates such a relationship between a defendant and the public. Without the anchor of a fiduciary relationship established by state or federal law, it was improper for the District Court to allow the jury to create one. We will therefore reverse Murphy's mail fraud

conviction and remand for a new trial in which the *Margiotta* theory of mail fraud will not be submitted.

Because we find reversible error in the mail fraud counts, we must consider whether the evidence the Government presented to support its invalid *Margiotta* theory tainted the jury's verdict on the Travel Act counts as well. The key step in this analysis is the identification of evidence admitted to prove the mail fraud counts that would not be admissible with respect to the charge of bribery under the Travel Act. If such evidence exists that prejudiced the verdict on the Travel Act, we must reverse the entire conviction. According to our decision in *United States v. Pelullo*, 14 F.3d 881, 898-99 (3d Cir. 1994), our investigation into prejudice requires an inquiry into whether: (1) the charges are "intertwined with each other"; (2) the evidence supporting the remaining counts is "sufficiently distinct to support the verdict" on these counts; (3) the elimination of the invalid count "significantly changed the strategy of the trial"; and (4) the prosecution used language "of the sort to arouse a jury."

Murphy contends that under *Margiotta*, the Government was entitled to present evidence about his role in Passaic County government that was prejudicial and not admissible to prove bribery under the Travel Act. We agree. At trial, the Government often justified its admission of evidence regarding Murphy's activities in the County that were unrelated to the specific contracts-for-payments scheme with CMSI by claiming that such evidence supported its *Margiotta* theory of mail fraud. The jury evidently viewed this evidence as concerning the mail fraud *and* Travel Act counts because in a query to the District Court during its deliberations, the jury asked how evidence of Murphy's political activities, which mostly included evidence to prove the *Margiotta* theory, affected the elements of both criminal offenses. Further, much of the evidence that related only to the *Margiotta* theory was highly damaging because it suggested that Murphy had the propensity to engage in corrupt activities.

Finally, because Murphy wanted to limit the evidence of his involvement in Passaic County politics in order to lessen the appearance that he acquired a fiduciary duty to

the County under the *Margiotta* theory, it appears that he might have employed a different defense strategy absent this impermissible theory to counter the charge in the Travel Act counts that he had the intent to engage in a corrupt *quid pro quo* rather than ordinary and legal patronage. We must therefore set aside the conviction on Travel Act counts as well as the mail fraud counts, and remand to the District Court for a new trial.

## I.

The charged conduct arose out of a "contracts-for-payments" scheme that involved the award of $1,207,199 of Passaic County contracts in exchange for $72,879.25 in payments to four individuals designated by Murphy. We construe the facts on which Murphy's conviction is based "in the light most favorable to the Government, as we must following the jury's guilty verdict." *United States v. Perez*, 280 F.3d 318, 323 (3d Cir. 2002) (citing *Glasser v. United States*, 315 U.S. 60, 80 (1942)).

### A. Murphy's Influence in Passaic County Politics

The Government adduced extensive evidence at trial about Murphy's dominance of numerous aspects of Passaic County's politics. To understand this evidence, some background on the County's political system is necessary. The County is managed by a seven-member Board of Freeholders elected by the voters. The Freeholders have ultimate legislative and administrative responsibility for the County, which includes the approval of County contracts. Because the Freeholders serve part-time and meet only biweekly, an unelected County Administrator conducts the day-to-day operations of the County and serves at the pleasure of the Freeholders. The County Administrator is charged with the responsibility to negotiate contracts on behalf of the County, review and recommend contract bids to the Freeholders, monitor the operations of contractors, and approve payments on contracts.

During the relevant period, all seven Freeholders were members of the Republican Party. As Republican Party County Chairman, Murphy strongly influenced who in his

party ran for Freeholder, which Freeholders could run for re-election, who would receive campaign funds, and how the Board of Freeholders operated. Testimony by the County Administrator, Nicola DiDonna, indicated that Murphy hand-picked the membership of the Freeholder committees in order to maintain control over the Freeholders' decision-making process.[1] Murphy also took an active role in determining the agenda of Freeholder meetings, including making suggestions about how to vote on resolutions, the selection of contract vendors, and the employment of County personnel.

County Administrator DiDonna apparently owed his job security to Murphy as well. Although DiDonna had been appointed several years before Murphy assumed the Chairmanship of the Republican Party, DiDonna testified as to his belief that his continued enjoyment of his job depended on a positive relationship with Murphy. He also explained how Murphy communicated with the heads of the various County agencies in order to influence their selection of vendors for County contracts and applicants for public employment positions. Although the Freeholders approved the selection of contractors and County personnel, Murphy directed the entire process. Murphy's role was not a secret, and potential contractors knew that they needed his approval before presenting bids to DiDonna or the Freeholders.

### B. The Contracts-for-Payments Scheme

In early 1994, CMSI, a company seeking to provide various services to Passaic County, hired Angelo Joseph "Buddy" Fortunato, a former State Assemblyman who had known Murphy's father, to assist in obtaining County contracts.[2] Prior to that time, CMSI held no contracts with

---

1. Prior to the commencement of Murphy's trial, DiDonna pleaded guilty to two counts of conspiracy to commit mail fraud. In return for his testimony against Murphy, DiDonna received a reduced sentence of 4 months incarceration.

2. Fortunato pleaded guilty to one count of conspiracy to commit mail fraud. Like DiDonna, in return for testifying against Murphy, Fortunato received a reduced sentence of 3 years of probation.

the County. Fortunato organized a meeting in February 1994 at Anthony's, a restaurant owned by Murphy in Totowa, New Jersey, at which Fortunato informed Murphy of CMSI's interest in doing business with the County, and Murphy expressed interest in the idea. Murphy arranged a follow-up meeting at his restaurant among the principals of CMSI, Robert Jorgensen and Matthew Burstine, Fortunato, Albert C. Lisbona (a mutual friend of Murphy and Fortunato), County Administrator DiDonna, and himself to see what types of contracts the County could award CMSI. At that meeting, Jorgensen and Burstine proposed that CMSI manage the County's workers' compensation claims, and stated that they could save the County about a million dollars from a reduction in abuse of the system.

Approximately a week later, Murphy spoke again with Fortunato, Jorgensen, and Burstine when they were dining at his restaurant. In response to Murphy's complaint that people were always pestering him for jobs, Burstine suggested that he could help Murphy by creating a four person "Panel" to advise CMSI. Murphy responded favorably and proposed that the Panel be funded with a portion of the proceeds from any contracts CMSI entered into with the County. In order to pay the Panel the desired sum of $100,000, Burstine and Murphy determined that about $1,000,000 in County contracts would be necessary, which Murphy would help to procure.

Shortly thereafter, Murphy provided Fortunato with a list of four persons to serve as Panel members and the amounts that each should be paid, which Fortunato relayed to Burstine at CMSI. Murphy chose Curt Masklee, his best friend and business partner; John Bonazzi, an undersheriff in the Passaic County Sheriff's Department; Joseph DiDonna, County Administrator DiDonna's father; and Joseph DiPasquale, a member of the State Waterfront Commission to whom Murphy owed a political favor, to serve as Panel members. There was circumstantial evidence presented at trial that Murphy received a portion of Masklee's payments as a kick-back, and that DiDonna took a piece of his father's proceeds.

Murphy then began to put pressure on DiDonna to award CMSI a County contract. When it became apparent that a

workers' compensation contract would not be available, Murphy pressed DiDonna to aid CMSI in bidding for a third party administration ("TPA") contract at the County jail, regardless of CMSI's lack of experience in this field. DiDonna aided CMSI throughout the bidding process and, notably, allowed it secretly to resubmit a bid after the submission period expired because CMSI had previously filed a bid that was considerably higher than those of its competitors. DiDonna then recommended the CMSI bid to the Board of Freeholders, while Murphy talked to several of the Freeholders about the contract. On July 20, 1994, the Board of Freeholders awarded the TPA contract to CMSI at its revised bid of $165,000.

A short time after the contract was awarded to CMSI, the Panel members had not yet received any payment. This upset Murphy, who relayed his concern to Fortunato. Fortunato explained that CMSI could not fulfill its obligation under the scheme unless it received advance payment on the TPA contract. Murphy contacted DiDonna, who made three months' worth of advance payment on the contract even though it had been in effect for only two weeks. In September 1994, the Panel met for the sole purpose of receiving their checks according to the amounts specified by Murphy. In order to conceal the operation, the Panel members were paid by a shell corporation established by Jorgensen and Burstine, called Physician's Management, and were instructed to pay taxes on the payments so that the Panel appeared legitimate. This pattern continued: Murphy would pressure DiDonna to ensure that CMSI was paid by the County, and Murphy would press Jorgensen and Burstine at CMSI to call another Panel meeting to distribute payments. No actual work was ever done by the Panel members, who did not have relevant expertise and provided no business advice or guidance to CMSI. Murphy was aware that the Panel members were being paid despite the fact that they did no work.

In order to continue the operation, Murphy, Jorgensen, and Burstine worked with DiDonna to find more County contracts that could be awarded to CMSI. Over the next year, DiDonna helped CMSI receive three more County contracts: $39,625 for arranging drug and alcohol testing

for operators of large trucks and heavy machinery; $173,250 to renew the TPA contract; and $624,000 to provide nursing services at the Passaic County Jail.

The scheme began to unravel in May 1996 when DiDonna became nervous about being pressured to find even more contracts for CMSI and the possibility that his father could be harmed if the scheme were exposed. Shortly thereafter, two of the Panel members, Joseph DiDonna and Curt Masklee, wrote letters of resignation. In June and July of 1996, the United States Attorney's Office approached Burstine and Jorgensen and let them know that the scheme had been uncovered. Although they both agreed to cooperate with the Government's investigation, Burstine tipped off Fortunato, Lisbona, DiDonna, and Murphy about the federal investigation and the possibility that CMSI's phones might be tapped. Nevertheless, the Government managed to record Jorgensen and Burstine's telephone conversations and tape meetings during the next two years in order to develop evidence presented at trial, including a conversation between Fortunato and Jorgensen in which Fortunato described the entire history of the scheme.

No further payments were made to the Panel nor contracts awarded to CMSI after the Government's investigation was exposed in July 1996. In total, the Panel members shared $72,879.25, which was derived from $1,207,199 in County contracts awarded to CMSI.

### C. Procedural History

Murphy was indicted by a grand jury. Counts One through Four of the indictment charged Murphy with violations of the Travel Act, 18 U.S.C. § 1952, the underlying predicate offense being bribery under the New Jersey bribery statute, N.J.S.A. 2C:27-2(a). The required interstate commerce element on these counts was four uses of the mails: two mailings of payments to the Panel, one mailing of an invoice with respect to the TPA contract, and one mailing of the nursing services contract. Counts Five through Eight charged violations under the mail fraud statute, 18 U.S.C. §§ 1341 and 1346, and were based upon the same mailings cited in the Travel Act counts. The mail

fraud counts were predicated on three theories of liability: first, that Murphy defrauded the County of "money and property"; second, that Murphy caused County Administrator DiDonna to breach his duty of honest services to the County by failing to disclose material information regarding the contracts awarded to CMSI; and third, that Murphy defrauded the County of its right to Murphy's "honest services in the affairs of the County."

The jury returned its verdict on May 14, 2001, convicting Murphy on Counts One through Three (all Travel Act), and Five through Seven (all mail fraud) but acquitting him on Counts Four (Travel Act) and Eight (mail fraud). The jury's verdict was general, and did not specify which theory or theories of mail fraud it believed Murphy had violated. At the sentencing hearing, the District Court increased Murphy's offense level by eight levels since the convictions involved a payment intended to influence an elected official or any official holding a high-level decision-making or sensitive position, pursuant to U.S.S.G. § 2C1.1(b)(2)(B). The Court also imposed a four level increase under U.S.S.G. § 3B1.1(a) because Murphy had organized criminal activity involving five or more participants. On September 18, 2001, the District Court sentenced Murphy to 43 months of incarceration, 3 years of supervised release, a fine of $20,000, restitution of $72,879.25 to Passaic County, and a special assessment of $600.

Judgment was entered on September 24, 2001 and Murphy filed a notice of appeal on the same day. The District Court had jurisdiction over the case pursuant to 18 U.S.C. § 3231. We have appellate jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742.

## II.  The *Margiotta* Mail Fraud Theory

The indictment charged Murphy with four counts of mail fraud pursuant to 18 U.S.C. §§ 1341 and 1346. To recapitulate, each count alleged three theories of how Murphy defrauded Passaic County: Theory One charged him with defrauding the County of money and property; Theory Two alleged a scheme to defraud the County of the honest services of its County Administrator; and Theory

Three accused Murphy of violating his duty to provide the County with his own honest services. As we have already noted, Murphy contends that Theory Three stretched the mail fraud statute beyond its reasonable bounds and improperly relied on the oft-criticized holding of *United States v. Margiotta*, 688 F.2d 108 (2d Cir. 1982), which sustained the conviction of a county chairman under similar facts. Murphy does not dispute the legal viability of the Government's other two theories, which we find legally sufficient for the reasons discussed *infra*.

## A. Review of General Verdicts

The Government contended at oral argument, and in supplemental briefing, that according to *United States v. Asher*, 854 F.2d 1483 (3d Cir. 1988), we should affirm the mail fraud convictions even if we determine that Theory Three, which relied on *Margiotta*, was not legally viable. In *Asher*, the jury returned a general verdict convicting the defendant of mail fraud, and thus did not specify whether it followed the prosecutor's monetary-loss or deprivation of honest services theory. After the conviction, the Supreme Court ruled in *McNally v. United States*, 483 U.S. 350 (1987), that honest services fraud was not a legally viable theory of prosecution under § 1341. Despite not knowing whether the jury relied on the now-impermissible honest services fraud theory, we sustained the defendant's conviction in *Asher* because we were "unable to hypothesize a set of circumstances under which this jury . . . could not have found a fraudulent scheme that consisted solely of depriving the citizens of their right to honest government that did not also involve tangible losses. . . ." 854 F.2d at 1495-96.

The jury in this case also returned a general verdict, and thus did not specify which of the Government's theories of mail fraud the jury believed Murphy had violated. In the Government's submission, even if we find the *Margiotta* theory of mail fraud not legally viable, we must sustain Murphy's mail fraud conviction because, as in *Asher*, there is no way that the jury could have found that Murphy deprived Passaic County of its right to his honest services without also finding that he devised a fraudulent scheme to

deprive the County of money, *i.e.,* the payments to the Panel. We need not evaluate the merits of the Government's contention, however, because the Supreme Court's opinion in *Griffin v. United States,* 502 U.S. 46 (1991), and our interpretation of *Griffin* in *United States v. Syme,* 276 F.3d 131 (3d Cir. 2002), undermine *Asher.*

In *Griffin,* the Court articulated a "clear line" distinguishing general verdicts that could have relied on a factually insufficient theory from those that might have been based on a legally invalid theory. 502 U.S. at 59. The former would be sustained, but the latter would merit reversal as the Court explained:

> Jurors are not generally equipped to determine whether a particular theory of conviction submitted to them is contrary to law — whether, for example, the action in question is protected by the Constitution, is time barred, or fails to come within the statutory definition of the crime. When, therefore, jurors have been left the option of relying upon a legally inadequate theory, there is no reason to think that their own intelligence and expertise will save them from error. Quite the opposite is true, however, when they have been left the option of relying upon a factually inadequate theory, since jurors are well equipped to analyze the evidence.

*Id.*

In *Syme,* we examined *Griffin* and the Court's prior decisions concerning whether general verdicts consisting of an unconstitutional, legally invalid, or factually inadequate theory could be sustained. We concluded that "under *Griffin,* if one of two or more alternative theories supporting a count of conviction is either (1) unconstitutional, or (2) legally invalid, then the reviewing court should vacate the jury verdict and remand for a new trial without the invalid or unconstitutional theory." 276 F.3d at 144. We are therefore satisfied that current precedent dictates that, should we find one of the Government's theories of mail fraud legally invalid, we must reverse Murphy's conviction on the mail fraud counts and remand for a new trial because the jury returned a general verdict.

## B. The *Margiotta* Opinion; The District Court's Charge

We turn to the merits of Murphy's contention that the Government's third theory of mail fraud, relying on *Margiotta*, is legally invalid. The mail fraud statute, 18 U.S.C. §§ 1341 and 1346, provides in relevant part:

§ 1341: Whoever, having devised or intending to devise any scheme or artifice to defraud . . . places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service . . . shall be fined under this title or imprisoned not more than 20 years, or both.

§ 1346: For the purposes of [18 U.S.C. § 1341, *et seq.*], the term "scheme or artifice to defraud" includes a scheme or artifice to deprive another of the intangible right of honest services.

We have interpreted this statute so that to prove mail fraud, "the evidence must establish beyond a reasonable doubt (1) the defendant's knowing and willful participation in a scheme or artifice to defraud, (2) with the specific intent to defraud, and (3) the use of the mails . . . in furtherance of the scheme." *United States v. Antico*, 275 F.3d 245, 261 (3d Cir. 2001).

In *Antico*, we reviewed the history of the mail fraud statute and its application to "honest services" fraud, which is also sometimes referred to as the "intangible rights" doctrine. *Id.* at 262 n.16. Until 1987, many courts applied "scheme or artifice to defraud" in 18 U.S.C. § 1341 broadly and extended it to schemes that defrauded citizens of their right to honest government services. The Supreme Court rejected this construction in *McNally, supra*, when it held that the mail and wire fraud acts did not prohibit conduct that defrauded citizens of their intangible right to honest services, but only of money or property. 483 U.S. at 359. That decision was informed by the Court's application of the rule of statutory construction that "when there are two rational readings of a criminal statute, one harsher than

the other, we are to choose the harsher only when Congress has spoken in clear and definite language." *Id.* at 359-60.

Unhappy with this holding and in response to the Court's desire for a clear legislative voice, Congress enacted 18 U.S.C. § 1346, which sought to restore the mail fraud jurisprudence to its status pre-*McNally. Antico,* 275 F.3d at 262 n.18; *see also Cleveland v. United States,* 531 U.S. 12, 20 (stating that "Congress amended the law specifically to cover one of the 'intangible rights' that lower courts had protected under § 1341 prior to *McNally*: 'the intangible right of honest services'"). Recognizing "Congress' clear intent in enacting § 1346," this court held in *Antico* that § 1346 "includes the prosecution of state and local officials and public employees for depriving the citizens they serve of their right to honest services." 275 F.3d at 262.

The prosecution of a private party official is, however, a horse of another color. The only case cited by either party that applied such an interpretation of the mail fraud statute is *Margiotta*.[3] In that case, the Court of Appeals for the Second Circuit upheld the conviction of Joseph Margiotta, the Chairman of the Republican Committee of Nassau County and the Town of Hempstead, New York. Like Murphy, Margiotta wielded significant political influence and used this power to construct a contracts-for-payments scheme far more extensive than that with which Murphy was charged. 688 F.2d at 113-14. Margiotta was indicted for, *inter alia*, one count of mail fraud, alleging that he defrauded the citizens of either (1) the right to the honest services of their government officials or (2) "the right

---

3. Aside from *Margiotta*, the Government can only muster a citation to the Supreme Court's opinion in *McNally* for the general proposition that a county chairman may act like a public official and owe a fiduciary duty to the government. This citation to *McNally* is unhelpful, however, since the Court only assumed the facts as the government presented them for the purposes of that case, and then went on to reverse the conviction anyway. 483 U.S. at 352, 361. No other court has expressly followed *Margiotta*, thus it remains the Government's sole direct authority. Indeed, it is questionable whether *Margiotta* is even good law any longer in the Second Circuit since that Court has expressly foreclosed the use of pre-*McNally* cases when construing the meaning of § 1346. *See United States v. Sancho,* 157 F.3d 918, 921-22 (2d Cir. 1998).

to Margiotta's honest and faithful participation in the governmental affairs of the Town, County, and State." *Id.* at 114.

On appeal, a divided panel of the Second Circuit rejected Margiotta's argument that an alleged deprivation of an intangible right to one's honest services under the mail fraud statute could exist only when the defendant owed a fiduciary duty to the victim based on a formal legal relationship. 688 F.2d at 121-22. In the political context, Margiotta had contended that the statute should only reach public officials, who owe a fiduciary duty to their constituents, and not party officials, who only owe a fiduciary duty to their employer, the political party. Initially, the panel recognized the pitfall in finding a private actor equivalent to a public official for the purposes of criminal liability and noted:

> On the one hand, it is essential to avoid the Scylla of a rule which permits a finding of fiduciary duty on the basis of mere influence or minimum participation in the processes of government. Such a rule would threaten to criminalize a wide range of conduct, from lobbying to political party activities, as to which the public has no right to disinterested service. On the other hand, the harm to the public arising from the sale of public office and other fraudulent schemes leads us to steer a course away from the Charybdis of a rule which bars on all occasions, as a matter of law, a holding that one who does not hold office owes a fiduciary duty to the general citizenry even if he in fact is conducting the business of government.

*Id.* at 122.

Despite these concerns, the panel approved a gestalt approach that allowed the jury to derive a fiduciary duty on the part of Margiotta based on (1) a general reliance test, which looked at whether others relied on Margiotta "because of a special relationship in the government," and (2) a de-facto control test that examined whether Margiotta was "in fact mak[ing] governmental decisions." *Id.* at 122. The Court defended these tests by claiming that they "recognize the important distinction between party business

and government affairs, permitting a public official to act in accordance with partisan preferences or even whim, up to the point at which he dominates government." *Id.*

Although the panel recognized that there might be federalism problems in using a federal criminal statute to prosecute local political actors, it girded its holding by citing New York state cases that supported the broad proposition that political party officials might owe a fiduciary duty to the citizenry under state law. *Id.* at 124-25. Even so, the panel abjured a narrow holding that "absent a showing of a violation of New York statute or a duty imposed by New York law, a defendant may not be found guilty" of mail fraud because the statute was enacted to "prohibit the use of mails for promoting schemes contrary to federal public policy." *Id.* at 125. In other words, although it found some state law that supported the holding, the panel clearly rejected the contention that the prosecution must prove that the defendant violated a state law in order to sustain his mail fraud conviction. *Id.*

After approving this mail fraud theory, the Second Circuit panel looked at the sufficiency of the evidence. It found that the district court had correctly instructed the jury that "in order to decide that Margiotta had breached his fiduciary duty, it had to find that Margiotta had concealed from those in Government who rely on his participation material information concerning his entry into a corrupt agreement to influence him in the performance of his governmental functions." *Id.* at 127 (quotations omitted). Further, the panel noted that "an affirmative duty to disclose could reasonably be inferred from the de facto employer-employee relationship Margiotta enjoyed with the municipal government." *Id.* at 128. Finding ample evidence that the jury could infer both a fiduciary duty and a breach thereof, the Court affirmed the conviction of Margiotta on the mail fraud count. *Id.*

The District Court in the case at bar relied extensively and exclusively on *Margiotta* in its charge to the jury on the Government's Theory Three of mail fraud. The Court's reliance is evidenced, for example, in the charge to the jury, which read in relevant part:

In order to find the defendant guilty of defrauding Passaic County and its citizens of their right to his own honest services you must find that the defendant Murphy had a fiduciary duty and that he violated that duty by failing to disclose material information. An individual may have such a fiduciary duty even if he is technically not an employee of the particular local government—here, Passaic County. An individual who knowingly undertakes the business of governing a particular jurisdiction owes a duty of loyalty to the citizens just as does one who formally holds public office. An affirmative duty to disclose can reasonably be inferred from what is essentially an employer-employee relationship. Thus, you may find that the defendant Murphy had a fiduciary duty to Passaic County and its citizens, if you find that the work done by [the] defendant was in substantial part the business of Passaic-County [*sic*] government, rather than being solely party business, and that the performance of that work was intended by him and relied on by others in Passaic County government as part of the business of government in order to carry forward its affairs as a whole. In determining whether the defendant had a fiduciary duty, among other things, you should consider whether the defendant regularly participated in the selection of persons for public positions, regularly participated in the selection of vendors for Passaic County business, or otherwise regularly participated in running Passaic County business. If you find that defendant Murphy essentially served as a fiduciary for Passaic County, then he had a duty to disclose material information to those in Passaic County government who relied on him.

Essentially, the charge stated that if Murphy knowingly undertook governmental functions and others relied on him, then he could have a fiduciary duty that he breached by not notifying Passaic County of the arrangement to award contracts to CMSI in return for payments to the Panel.

### C. Is *Margiotta*'s Honest Services Fraud Theory Legally Viable?

#### 1. The Parties' Contentions; Judge Winter's Dissent

Murphy urges us not to follow *Margiotta* for several reasons. First, he points out that our recent decision in *United States v. Panarella*, 277 F.3d 678 (3d Cir. 2002), precludes a broad reading of *Margiotta*'s holding that a jury may find that a party official has a fiduciary duty absent any reference to a breach of fiduciary duty found in state law. In *Panarella*, we held that "the existence of a violation of state law . . . is sufficient to establish honest services wire fraud," though we did not resolve the issue of whether a state law duty was necessary. *Id.* at 699 n.9. Second, Murphy argues that the indictment and charge in this case did not allege that Murphy had a fiduciary duty based on New Jersey state law to disclose material information to Passaic County. Finally, he contends that reading § 1346 as imposing a fiduciary duty on local party officials without reference to state law would violate the "clear statement" rule, the principle of lenity, and that of federalism, which we noted in *United States v. Antico, supra,* and *Panarella*, were significant concerns regarding the application of the statute. In support of his position, Murphy invokes Judge Winter's forceful *Margiotta* dissent, which illustrated the numerous problems with allowing a jury to find a fiduciary duty without any reference to established law.

Judge Winter opined that although the majority's opinion in *Margiotta* was based on precedents that pushed honest services mail fraud to its logical limit in reaching public officials, it was an unacceptable leap to allow "a jury [to] find that a politically active person has sufficient influence and power over the acts of elective officials to be subject to the same duty as those officials so far as those acts are concerned." 688 F.2d at 142 (Winter, J., dissenting). In Judge Winter's view, the source of this "impermissible result" was "an erroneous analogy between fiduciary relationships involving private parties . . . and relationships between politically active persons and the general citizenry in a pluralistic, partisan, political system." *Id.* Noting the varying requirements of fiduciary duties in different

contexts (*e.g.*, employer-employee, trustee-beneficiary, director-shareholders, etc.), Judge Winter faulted the majority for allowing a jury to find that a party official could have a fiduciary duty absent some guidance. *Id.* Such a result, Judge Winter reasoned, leaves juries the freedom "to apply a legal standard which amounts to little more than the rhetoric of sixth grade civics classes." *Id.*

The Government asks us not to follow Judge Winter's dissent because it contends that it pertained to the problems of "honest services" fraud generally, and Congress has since resolved this concern by enacting § 1346 to allow for these types of prosecutions. The Government also points to this court's decisions in *Antico* and *Panarella*, which held that § 1346 was a sufficiently clear statement to permit the prosecutions of public officials. Murphy finds the Government's citations to *Antico* and *Panarella* unpersuasive; he notes that Judge Winter reasoned that for private party officials "there is no description" of "a line between legitimate patronage and mail fraud." *Id.* at 115, 117. Murphy argues that we must draw such a bright line. He claims that while government officials are bound by their office to act in the public interest, a party official is an entirely different creature. He further contends in his brief that party officials "are expected to pursue their self-interest. Far from impartial, they are entitled to be partisan. In the rough-and-tumble of politics, they will bring pressure upon public officials to favor their interests above others'. . . ."

Murphy also cites our own precedent expressly rejecting an analogy between county chairmen and government officials in a one-person, one-vote case. *Lynch v. Torquato*, 343 F.2d 370, 372 (3d Cir. 1965). In *Lynch*, we determined that "the normal role of party leaders in conducting internal affairs of their party, other than primary or general elections, does not make their party offices governmental offices . . . ." *Id.* Rather, local party leaders "may be responsible for raising and spending money in the party interest"; "may plan and direct" campaigns, issue advocacy, and voter registration drives; and "may administer political patronage." *Id.* While that case noted that there may be some situations in which a party official's activities could

be considered state action (*e.g.*, when making emergency nominations for public office), we squarely rejected the idea of viewing county chairmen and government officials equivalently. *Id.*

### 2. Is the Government's Theory that a County Chairman May Act Like a Public Official and Acquire a Fiduciary Duty to the Local Government Viable?

We turn to an analysis of the Government's *Margiotta* theory. While the idea of allowing a jury to determine whether a party official acted enough like a government official is itself enough to give us pause, the Government recognized belatedly in this appeal the apparent need for a state law source to buttress its theory of honest services fraud. As noted above, the *Margiotta* court skirted the issue of whether state law is relevant to a mail fraud conviction. 688 F.2d at 105 n.2. Both parties here have recognized, however, that in our decisions in *Panarella* and *Antico* we noted that a violation of state law serves as an important limiting principle on the scope of § 1346 honest services fraud, which might be necessary to avoid lenity and federalism concerns in federal prosecutions of state or local political officials. *Panarella*, 277 F.3d at 693; *Antico*, 275 F.3d at 262 n.18.

Before determining whether a state law predicate is indeed necessary, we need to see if the Government asserts a valid predicate. The first time the Government actually articulated a state law predicate, a violation of the New Jersey Bribery Act, N.J.S.A. 2C:27-2, was in its brief on appeal. Neither the indictment nor the charge informed the jury that they needed to find that Murphy violated a state law in order to determine whether he had a fiduciary duty to Passaic County. Although the jury convicted Murphy of violating the New Jersey Bribery Act, that served as the predicate of the Travel Act counts and was not advanced in connection with mail fraud. At all events, despite the Government's new appellate argument, we are not persuaded that the New Jersey Bribery Act provides a fiduciary duty on the part of Murphy as a party official to disclose material information to Passaic County for several reasons.

First, as noted above, the jury was never asked to determine whether a fiduciary duty could be inferred from the New Jersey Bribery Act. Theory Three of the charge asked the jury to consider generally "whether the defendant regularly participated in running Passaic county business," but it did not allege that Murphy was involved in a scheme that violated the New Jersey Bribery Act, but rather that he breached "a duty to disclose material information to those in Passaic County government who relied on him." While the Government is correct in noting that N.J.S.A. 2C-27-2 applies to party officers as well as public officials, it cannot point to anything in the statute that creates a fiduciary duty on the part of party officials to disclose information to the government. Rather, the statute only proscribes "the solicit[ation], accept[ance], or agree[ment] to accept from another . . . [a]ny benefit as consideration for a decision, opinion, recommendation . . . ." *Id.* Moreover, while bribery may often accompany breaches of a duty to disclose, *see Panarella*, 277 F.3d at 695, and may even be the paradigm case of honest services fraud committed by public officials, *see United States v. DeVegter*, 198 F.3d 1324, 1327 (11th Cir. 1999), the Government points to no case that found that a bribery statute can create an obligation to provide honest services without any preexisting legal duty.

This final point is the crux of the issue, and it presents a slightly different question from that which we addressed in *Antico* and *Panarella*. In those cases we assumed, based on extensive pre-*McNally* case law, that public officials have a duty to provide honest services to the public. We then looked to state law to ascertain what standards of fiduciary care the public officials were required to meet in order to determine whether the officials defrauded the citizens of their right to honest services.[4] For example, in *Antico*, we

---

4. In *Antico,* the defendant was himself a public official. In *Panarella*, the defendant was a private businessman who bribed a Pennsylvania State Senator, but the Government's theory was that the defendant was guilty of being an accessory after the fact under 18 U.S.C. § 3 to a wire fraud scheme to deprive the public of the State Senator's honest services in violation of 18 U.S.C. §§ 1343, 1346. 277 F.3d at 689. Thus, the central inquiry was whether the State Senator had committed honest services wire fraud—not whether the defendant had done so.

referred generally to state and local conflict of interest laws to identify what fiduciary duties the defendant owed to the public. 275 F.3d at 264. And, in *Panarella*, we found "that the clarity of [the state's] disclosure statute criminalizing a public official's nondisclosure of his sources of income addresses rule of lenity concerns . . . more effectively than does [a general prohibition against] 'misuse of office for personal gain.'" 277 F.3d at 693. These cases best support Theory Two of the Government—that Murphy participated in a scheme to defraud Passaic County of County Administrator DiDonna's honest services—since the bribery statute clearly relates to services that DiDonna, as a public official and fiduciary, owed to the citizenry.

These cases do not, however, answer the question whether the New Jersey Bribery Act alone can create a fiduciary *relationship* that could then serve as the predicate for determining that Murphy himself owed honest services to Passaic County and its citizens. Murphy submits that *McNally* stands for the general proposition that absent a "clear statement" from Congress, a court should not "construe the [federal mail fraud] statute in a manner that leaves its outer boundaries ambiguous and involves the Federal Government in setting standards of disclosure and good government for local and state officials." 483 U.S. at 350. We agree. Although we have held that § 1346 was a clear statement by Congress that it wished to criminalize honest services fraud, *see Antico*, 275 F.3d at 261, we recognized in *Panarella* the need for a "limiting principle defining the scope of honest services fraud." 277 F.3d at 694.

More specifically, this is because the plain language of § 1346 provides little guidance as to the conduct it prohibits. We explained:

> Deprivation of honest services is perforce an imprecise standard, and rule of lenity concerns are particularly weighty in the context of prosecutions of political officials, since such prosecution may chill constitutionally protected political activity. Moreover, decisions of our own Court stating that "fraud is a broad concept that 'is measured in a particular case by determining whether the scheme demonstrated a

> departure from fundamental honesty, moral uprightness, or fair play and candid dealings in the general life of the community,' " [citations omitted] do little to allay fears that the federal fraud statutes give inadequate notice of criminality and delegate to the judiciary impermissibly broad authority to delineate the contours of criminal liability.

*Id.* at 698; *see also Crandon v. United States*, 494 U.S. 152, 158 (1990) (stating that the rule of lenity "serves to ensure that there is fair warning of the boundaries of criminal conduct and that legislatures, not courts, define criminal liability"). We thus endorse (and are supported by) the decisions of other Courts of Appeals that have interpreted § 1346 more stringently and required a state law limiting principle for honest services fraud, as set forth in the margin.[5]

Murphy urges us to address the issue we reserved in a footnote in *Panarella*: Whether a violation of a state-law created fiduciary duty is *required* to sustain an honest services fraud conviction. *Id.* at 699 n.9. Although

---

5. In *United States v. Brumley*, 116 F.3d 728 (5th Cir. 1997), for example, the Court of Appeals for the Fifth Circuit held *en banc* that state law must provide the specific honest services owed by the defendant in a fiduciary relationship. *Id.* at 734. Looking at the plain language of the statute, the Court found nothing "to suggest that Congress was attempting in § 1346 to garner to the federal government the right to impose upon states a federal vision of . . . an ethical regime." *Id.* Rather, "[u]nder the most natural reading of the statute, a federal prosecutor must prove that conduct of a state official breached a duty respecting the provision of services owed to the official's employer under state law." *Id.*

Similarly, the Court of Appeals for the Second Circuit concluded that § 1346 stands "for the proposition that a scheme to harm another by breach of a duty enforceable by an action in tort may support a conviction for a scheme to defraud another of 'honest services,' " *United States v. Handakas*, 286 F.3d 92, 106 (2d Cir. 2002), but it then found § 1346 unconstitutionally vague as applied to a conviction of honest services mail fraud based on the violation of duties to report material information as mandated by state labor and constitutional law. *Id.* This holding is much broader than this court's in *Panarella* in that the *Hanadakas* Court concluded that wrongs covered by state criminal and contract law could not form the basis of a definition of "honest services."

federalism concerns are paramount in federal prosecutions of local political party officials, we do not think that this case requires us to resolve that question. This is because *Panarella* and *Antico* address the different issue of what *types* of fiduciary duties are required, within the meaning of honest services, when either state or federal law already clearly establishes a fiduciary relationship. Here, in contrast, the Government cannot identify any clearly established fiduciary relationship or legal duty in either federal or state law between Murphy and Passaic County or its citizens. In other words, it cannot point to an established "right" of honest services that Murphy owed to the County or its citizens beyond a criminal statute, which we do not believe can create a fiduciary relationship. The Government's use of the *Margiotta* theory of honest services fraud therefore falls far outside the classical definition of fraud. *See Panarella,* 277 F.3d at 695 ("Fraud in its elementary common law sense of deceit . . . includes the deliberate concealment of material information in a setting of fiduciary obligation.") (quoting *United States v. Holzer*, 816 F.2d 304, 307 (7th Cir. 1987)).

Reading the New Jersey Bribery Act as the Government does would require us to find not merely a duty owed in that statute, but also the predicate for a fiduciary relationship between a county political chairman and the public. We cannot endorse this methodology because all criminal activity would breach a duty to the public not to break the law that could then form the basis of a mail fraud conviction. This outcome would, of course, run counter to the federalism concerns we expressed in *Panarella* about the potentially limitless application of § 1346. While we recognize that the New Jersey Bribery Act properly restricts the conduct of party officials, probably in recognition of their influential political position, we cannot read it as creating a fiduciary or other legal relationship to the public.

Without any legal basis for determining whether Passaic County or its citizens had a right to Murphy's honest services, we conclude that it was improper for the District Court to allow the jury to conjure such a duty out of a fog of assumptions. In *Panarella* we warned about the "parade

of horribles envisioned by those who fear overly broad application of the federal mail and wire fraud statutes." 277 F.3d at 699. One example of such an overly broad application we cited was from Judge Winter's dissent in *Margiotta*, in which he posited that under the *Margiotta* theory, "[a] partisan political leader who throws decisive support behind a candidate known to the leader to be less qualified than his or her opponent because that candidate is more cooperative with the party organization, is guilty of mail fraud unless that motive is disclosed to the public." 688 F.2d at 140 (Winter, J., dissenting). While Murphy's actions certainly were not the same as in this hypothetical, we note that there is nothing in *Margiotta* that would prevent an over-zealous prosecutor from pursuing this scenario.

Further, we agree with Judge Winter that *Margiotta* fails to provide any logical rationale for treating private party officials in the same manner as public officials since such a loose interpretation of the mail fraud statute creates "a catch-all political crime which has no use but misuse." *Id.* at 144; *see also* John C. Coffee, Jr., Modern Mail Fraud: The Restoration of the Public/Private Distinction, 35 *Am. Crim. L. Rev.* 427, (Spring 1998) ("The overreach in [*Margiotta*'s] theory is obvious and invades even the sphere of the First Amendment.").

Because *Margiotta* is in direct contravention of the principles of honest services fraud we articulated in *Antico* and *Panarella,* and the jury did not specify which theory of mail fraud it believed Murphy violated, we will reverse Murphy's conviction on the mail fraud counts and remand to the District Court for a new trial absent this legally invalid theory.

### III. Did Spillover of *Margiotta* Evidence "Taint" the Entire Conviction?

Murphy contends that should we reverse on the mail fraud counts, we must also vacate the entire conviction because the evidence presented by the Government to support its invalid *Margiotta* theory of mail fraud "tainted" the jury's verdict on the Travel Act counts as well. When we

find reversible error on one or more counts, we consider "whether the presence of the [invalidated] count[s] had any spillover effect sufficiently prejudicial to call for reversal" of the remaining counts. *United States v. Pelullo*, 14 F.3d 881, 897-98 (3d Cir. 1994) (citation omitted).

The critical factor in any claim of "taint" is the existence of evidence admitted to support the invalid counts that would not be admissible to prove the remaining counts. *United States v. Cross*, 308 F.3d 308, 318 (3d Cir. 2002). Only if we find such evidence must we "consider whether the verdict on the remaining count was affected adversely by the evidence that would have been inadmissible at trial limited to that count." *Id.* This requires an inquiry into whether (1) the charges are "intertwined with each other"; (2) the evidence for the remaining counts is "sufficiently distinct to support the verdict" on these counts; (3) the elimination of the invalid count "significantly changed the strategy of the trial"; and (4) the prosecution used language "of the sort to arouse a jury." *Pellulo*, 14 F.3d at 898-99.

Murphy claims that the Government was allowed to put on a considerable amount of evidence to support its *Margiotta* theory that would otherwise have been inadmissible solely to prove bribery under the Travel Act. As explained in Section II of this opinion *supra*, the cornerstone of the *Margiotta* theory as applied in this case was that Murphy acquired a fiduciary duty to Passaic County and its citizens by virtue of his extensive influence over the County's governance. Because the jury would be charged with determining whether this fiduciary duty existed based on how Murphy participated in County governance, the Government was entitled to present evidence detailing all aspects of Murphy's involvement in County politics.

As Murphy points out, much of this evidence was not directly related to the bribery charges under the Travel Act. Murphy specifically identifies testimony by Passaic County Administrator DiDonna and Panel member Curt Masklee concerning the power Murphy wielded in the County and statements that Murphy handpicked and controlled the County Freeholders, ran County business at his restaurant, and boasted that he had the jobs of 2,000 people in his

hands. [A132-38, 152-304.] Some of this evidence gave the impression of Murphy as a back-slapping, corrupt party boss.

More specifically, in testimony recorded in over 160 pages of transcript, Masklee and DiDonna explicate Murphy's role in and control over Passaic County government as exemplified by the following statements: Murphy would "hold court" at his restaurant where he would discuss County business; Murphy had an interest in who handles County bonds; Murphy cooperated with the County Sheriff to prevent State Senator Joe Bubba from countering Murphy's control of the County; there was an alliance between Murphy and the County Sheriff since 1991 to assert dominance over County affairs; Murphy allegedly stated, "I hold the careers of people in my hand, 2,000 people, I hold their jobs in my hands"; Murphy demonstrated to the vendors the power he had in the County; Murphy determined on which committees the Freeholders would serve so that he could have "ultimate control"; Murphy got his friend appointed as County Adjuster; Murphy's orders to the Freeholders to confirm his recommended appointments are more than a "mere recommendation"; Murphy arranged for a part-time job for an associate at the Office of Aging; Murphy aided a subcontractor in his attempt to get paid by a contractor by providing the contractor with an emergency County contract in return; Murphy helped the son of a County official get transferred to another government job; he helped the same official's campaign worker get a government position; Murphy got a labor lawyer hired who was meant to do work at the County hospital but instead spent his time trying to get a bill passed in the State legislature that would have provided the undersheriff with job protection; Murphy ensured that there was always enough County work for another lawyer, who would clear settlements of County matters with Murphy before going to the Freeholders; Murphy helped the State Democratic Party chairman obtain consulting work in the County, including as part of various construction contracts; Murphy occasionally received flow charts of the County departments from DiDonna so that he would know where he could place individuals in County jobs; he also received the vender list,

which Murphy would use to solicit venders for political fundraising; Murphy placed the wife of his friend Curt Masklee on the Welfare Board, an autonomous County agency; Murphy ordered a letter drafted to the State Medical Examiner so that an individual who ran a local funeral home could continue doing business with the County Medical Examiner; at the request of the Sheriff, Murphy had an individual appointed to handle security for the Vo-Tech school; the Sheriff and Murphy also cooperated to choose the appointment for Emergency Management Coordinator, and Murphy pressed DiDonna to put this choice before the Freeholders even after he did not appear on the first selection list, which the Freeholders did because he was "Murphy's guy"; Murphy successfully urged the County payroll supervisor to reduce the salary of the newly elected County Clerk compared to the prior Clerk because she sent a flier saying that the Sheriff endorsed her without the Sheriff's approval; Murphy also told the new Clerk whom he wanted her to hire as Deputy Clerk and what that person's salary should be, orders she should follow if she would want a raise in the future; Murphy would get people appointed to County jobs by disregarding the Civil Service list; Murphy intervened to assist a relative who worked for the County Utilities Authority in settling his disability claim; Murphy helped a construction company that built the County Administration Building get paid when it was having problems with the County; Murphy helped a fellow resident from Totowa get a raise and a job title change; the Sheriff and Murphy collaborated in getting the former police chief of Prospect Park appointed part time director of the police academy; Murphy played a role in arranging for raises for County attorneys by lobbying the Freeholders; Murphy intervened to prevent a groundskeeper at the hospital from getting fired; he also got the cook at his restaurant a second job at the hospital, which posed problems with the union because only this cook got the weekend off (to work at Murphy's restaurant); Murphy created a legal instructor job in the County Counsel's Office to help an individual who needed health benefits; he also got a lawyer who worked for a political rival a County job so as to make that lawyer loyal to him and weaken his rival; Murphy ordered the appointment of an insurance

agent on record for the County and a secretary in the Public Works Department to similarly gain the loyalty of these individuals who were associated with a political rival; the president of the County College came to Murphy at his restaurant asking for help in his reappointment, which Murphy successfully did; Murphy urged the creation of a job in the Department of Human Services for a lawyer who needed a job, but this individual did no real work; Murphy promoted the hiring of an individual for a post at the County-run camp; Murphy helped Albert Lisbona, a Panel member and friend of Murphy, in securing legal work for the County on its bond issues in exchange for a monetary kickback to Murphy;[6] Murphy also arranged for the provision of a piece of the bond issues work to an accountant of his choosing; Murphy ordered the Freeholders to set a certain salary for the County's Registrar of Deeds and his deputy; Murphy placed a lawyer on the County high school's payroll; Murphy helped a political protege who lost an election to get a job in the Community College; Murphy met with the head of the County Parks Department at his restaurant and notified the official that he supported him continuing in that position; Murphy interceded to prevent the hospital from laying-off its finance manager; Murphy determined who would get the host benefit payments from the revenues generated by the County's waste transfer station; Murphy got involved in negotiations to expand the size of the waste transfer station and ostensibly represented the County in this transaction; Murphy also negotiated a settlement with the developer on a failed project to build an incinerator; Murphy bailed out someone who purchased land for development but was prevented from doing so because of environmental reasons by having the County purchase the land and turn it into a park; Murphy orchestrated a plan to get a former Freeholder appointed as director of the County

---

6. It is particularly instructive that in response to Murphy's objection to DiDonna's testimony on this unrelated kickback scheme, the Government claimed that there was no issue of inadmissible character evidence under Fed. R. Evid. 404 because the testimony related to Murphy's "give and take with respect to vendors," which suggests Murphy's role in influencing County governance under *Margiotta*, but does not imply any relevance to the bribery charge under the Travel Act.

Utilities Authority, and then negotiated a generous severance package when the County sought to have the newly-hired director fired from the job; and Murphy took care of the County chairman for the Democratic Party by supporting him on the Welfare Board.

The Government counters that this evidence would have been admissible to prove bribery under the Travel Act in order to show that Murphy had the opportunity and ability to orchestrate the contracts-for-payments scheme. We do not gainsay that some of this evidence might also have been admissible under the Government's first two theories of mail fraud, and thus did not only go to the impermissible *Margiotta* theory. However, we think that the proper method for evaluating "taint" is to look at whether any "evidence introduced to support the reversed count," in this case, the mail fraud counts, "would have been inadmissible at a trial on the remaining count." *Cross*, 308 F.3d at 317. "We deal here with the three remaining counts — the Travel Act counts incorporating the New Jersey Bribery Act. While we agree that portions of this *Margiotta* evidence might still have been admissible to prove the bribery or Travel Act violations, we do not find this argument sufficient to avoid Murphy's charge of "taint" for several reasons. First, the Government admitted before the District Court that its reason for presenting much of this evidence was to prove its *Margiotta* theory of mail fraud. For example, in response to an objection by Murphy as to some testimony by Curt Masklee, the Government stated that "there is going to be hours of testimony from Mr. DiDonna, about Mr. Murphy's involvement on the *Margiotta* issues" and that "[t]he evidence will show on a broader level that Mr. Murphy had direct involvement in the operations of Passaic County Government, and picking vendors, and picking employees to work in the county, and then *that goes directly to the central issue in this case of Mr. Murphy's involvement under the* Margiotta *issues.*" [A132, 133 (emphasis added).] This enabled the Government to admit practically any evidence on Murphy's political activities without having to show its relevance to the Travel Act counts.

Moreover, when the jury posed a question to the District Court regarding the interpretation of evidence of Murphy's

patronage activities, which substantially included evidence designed to prove the *Margiotta* theory, the jury clearly indicated that this evidence was central to its deliberations on both the mail fraud and Travel Act counts. It is therefore highly probable that the charges were "intertwined" in the mind of the jury, and that the jury relied on the evidence of Murphy's political activities in its deliberations on the Travel Act counts.

Murphy also argues convincingly that the absence of the *Margiotta* theory of mail fraud would have greatly changed his strategy at trial. Because evidence of Murphy's political involvement could be construed by the jury under this theory as creating a fiduciary relationship, Murphy wanted to minimize a discussion of his involvement in Passaic County governance. On the other hand, such evidence would have been useful to his defense to the Travel Act charge that he did not have the requisite criminal intent to turn the contracts-for-payments scheme into a corrupt *quid pro quo* because he routinely engaged in such patronage, which is legal. Absent the impermissible *Margiotta* theory, it is likely that Murphy would have employed a different defense strategy that would have allowed him free reign to present his role in the County in order to rebut the inferences that his participation in the scheme was anything more than ordinary and legal patronage.

Finally, as discussed above, some evidence of Murphy's influence over the Passaic County government may be relevant under the Travel Act counts in order to illustrate Murphy's role in the bribery scheme. But the quantum of evidence introduced to show Murphy in effect acted as a government official would not be necessary absent the *Margiotta* theory. The Court specifically instructed the jury that "[i]t is no defense to the charge of bribery that the person receiving or soliciting the bribe . . . was not qualified to act in the desired way whether because he had not yet assumed office, or lacked jurisdiction, or for any other reason." Thus, any evidence of favor-trading or inappropriate acts that did not have any relevance to the elements of bribery or to Murphy's opportunity to instigate this particular contracts-for-payments scheme would be irrelevant. The cumulative effect of unrelated evidence likely

32

left an impression with the jury that Murphy routinely engaged in corrupt political activities and thus might have had the propensity to engage in the charged contracts-for-payments scheme.

We also note that "[w]hen evaluating taint or spillover effect, courts have applied a test somewhat favorable to the defendant." *Pellulo*, 14 F.3d at 898. For the foregoing reasons, we are satisfied that "the jury was likely to be confused or relied upon improper evidence," *id.*, in its deliberations on the remaining counts, and that there was spillover of evidence from the improper *Margiotta* theory that tainted those convictions as well. We will therefore reverse the judgment and remand this case to the District Court for a new trial on all counts in which the Government may not use the *Margiotta* theory of honest services fraud liability.[7]

A True Copy:
        Teste:

*Clerk of the United States Court of Appeals
for the Third Circuit*

---

7. Because we will reverse the entire conviction and remand for a new trial, we do not need to address Murphy's arguments concerning allegedly insufficient supplemental instructions in response to the jury's queries during its deliberations, and allegedly erroneous evidentiary and sentencing rulings.