

2006 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

6-8-2006

# USA v. Gordon

Precedential or Non-Precedential: Non-Precedential

Docket No. 05-3927

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2006

Recommended Citation

"USA v. Gordon" (2006). *2006 Decisions.* Paper 932.
http://digitalcommons.law.villanova.edu/thirdcircuit_2006/932

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2006 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No: 05-3927
_____

UNITED STATES OF AMERICA,

Appellant

v.

THOMAS P. GORDON;
SHERRY L. FREEBERY;
JANET K. SMITH

_____


Appeal from the United States District Court
for the District of Delaware
(D.C. Criminal No. 04-cr-00063)
District Judge: Honorable John P. Fullam
_____

Argued May 15, 2006

Before: McKEE and GARTH,  Circuit Judges,
and LIFLAND District Judge*


_____

(Opinion filed: June 8, 2006)
_____

LEONARD P. STARK (Argued)
Assistant United States Attorney

_____

* The Honorable John C. Lifland, Senior District Judge of the United States
District Court for the District of New Jersey, sitting by designation.

Nemours Building, Suite 700
P.O. Box 2046
Wilmington, DE 19899-2046
Attorney for Appellant

RONALD H. LEVINE (Argued)
Post & Schell, P.C.
Four Penn Center
1600 JFK Boulevard
Philadelphia, PA 19103
Attorney for Appellee Gordon

ELIZABETH G. TAYLOR (Argued)
WILLIAM W. TAYLOR III
JAMES A. McLAUGHLIN
Zuckerman & Spaeder LLP
1800 M Street, N.W., Suite 1000
Washington, D.C. 20004
Attorney for Appellee Freebery

OPINION

McKEE, Circuit Judge.

The government appeals the District Court's dismissal of counts of an indictment that was returned against Thomas P. Gordon and Sherry L. Freebery charging them with honest services fraud.[1] Gordon is the County Executive for New Castle County, Delaware, and Freebery is that county's County Chief Administrative Officer ("CAO"). The counts dismissed refer to conduct the government alleges was part of a scheme it

---

[1] The indictment also charged Ms. Janet K. Smith, but the charges against her are not at issue in this appeal. We also note that neither Gordon nor Freebery presently occupy the positions they held at the time of their alleged actions which are the subject of the indictment.

2

refers to as the "Fieldstone Conflict of Interest Cover-Up Scheme" ("Fieldstone Scheme").[2] The court also struck allegations pertaining to the scheme from the remaining counts of the indictment, and the government filed this appeal.

For the reasons set forth below, we conclude that the District Court erred in ruling that the government had not properly alleged honest services fraud. Accordingly, we will reverse the order dismissing counts of this indictment and remand to the District Court for further proceedings consistent with this opinion with instructions to reinstate those portions of the indictment that the court dismissed.

## I. FACTS AND PROCEDURAL HISTORY

As alleged in the relevant portions of the indictment, defendants Gordon and Freebery devised and participated in a scheme to defraud New Castle County and its citizens of the intangible right to their honest services. Freebery allegedly was "loaned" millions of dollars by Lisa Dean Moseley when Moseley was developing the Fieldstone golf course in New Castle County ("Fieldstone Project"). Indictment, Count I, ¶ 19. The project needed various County approvals, including a permanent certificate of occupancy. According to the indictment, after Freebery received the "loan" from Moseley:

> Freebery . . . used the powers of her office to assist [Moseley] in connection with the Fieldstone Project and then Freebery and Gordon caused the removal of County records relating to the Fieldstone Project from County files, the falsification of County records relating to the Fieldstone Project, the use of the services of County employees, and the expenditure of

---

[2] Four other schemes were also charged in the indictment.

3

> more than $44,000 in County funds to hire lawyers to prevent
> the discovery of Freebery's financial relationship with
> [Moseley] and her involvement in the County's review of the
> Fieldstone Project.

Indictment, Count I, ¶ 19.

Specifically, Paragraph 20 of Count I charges that on or about October 4, 2000, Freebery caused her son, Patrick Duffy, to receive $500,000 from Moseley, in return for which, Duffy executed an interest-free, unsecured promissory note in that amount that was payable on demand. The note contained no schedule for repayment of principal. On or about October 5, 2000, Duffy allegedly gave Freebery a check for $400,000 of the $500,000 he had received from Moseley. According to the government, on January 1, 2001, Freebery caused Duffy to execute a second unsecured promissory note for $500,000, which was also payable on demand, and required no scheduled repayment of principal. However, unlike the first note, this note purportedly required an annual interest payment at the rate of 5.9% payable on December 31 of each successive year.

Paragraph 20 of the indictment also charges that on or about January 26, 2001, Freebery executed a promissory note for $2.3 million that she knew she would receive from Moseley. Like Duffy's second promissory note, it was unsecured, payable on demand, and required no scheduled repayment of principal. It also provided for annual interest payments at the rate of 5.9%. On or about January 26, 2001, Freebery purportedly received a wire transfer from Moseley of $1.3 million, and on or about February 1, 2001, she purportedly received another in the amount of $1 million.

4

Paragraph 21 charges that, as part of the scheme to defraud, Freebery "would and did intervene in the County's review of the Fieldstone Project." According to the indictment, on or about March 29, 2001, Freebery received a handwritten telephone message from a County employee, stating, "'SOS' Please call asap – needs help w/Fieldstone. Did not want me to act as intermediary. Wanted to hear from you." In May, 2001, Freebery allegedly directed "C.B.," a County employee in the Land Use Department, to find out why the Fieldstone Project had not yet received a permanent certificate of occupancy for its clubhouse. She also allegedly directed the Land Use Department to help the Fieldstone Project obtain the permanent certificate of occupancy. On or about May 29, 2001, Freebery allegedly caused "J.S." and "G.H.," two Land Use Department employees, to issue the certificate for Fieldstone. G.H. provided Freebery with the County's copy, on which he had written: "Chief, We Deliver, [G.]." Indictment, Count I, ¶ 21.

According to the indictment, in furtherance of the scheme, Freebery failed to disclose that she had received more than $5,000 from Moseley through Duffy on her May, 2001 Statement of Financial Interests ("SFI"). Indictment, Count I, ¶ 22. The indictment further alleges that, from about September, 2001 through May, 2002, knowing Freebery would have to disclose her financial relationship with Moseley on her 2001 SFI that was to be filed in May of 2002, Gordon and Freebery used County resources, including County funds, to retain outside lawyers in an attempt to avoid disclosing the relationship. Freebery purportedly caused the County Law Department to argue before

5

the County Ethics Commission that it should adopt an interpretation of the Ethics Code which would have made her SFI unavailable to the public. Indictment, Count I, ¶ 23. Gordon and Freebery also caused "K.V.," a member of the County Council, to send a letter to the Ethics Commission to persuade it not to disclose the CAO's SFI to the public. Indictment, Count I, ¶ 23.

The government further alleged that Gordon and Freebery engaged in efforts to cause County employees to undermine an investigation by the *News Journal*, a local newspaper. The paper was investigating Freebery's financial relationship with Fieldstone's owner and whether Freebery had intervened in the County's review of the Fieldstone Project. According to the indictment, Gordon and Freebery directed J.S. and C.B. to remove a memo dated March 24, 1999 addressed to Freebery and outlining the chronology of the County's review of the project from the County's Fieldstone file. That allegedly was done "in response to [Freebery's] request." Indictment, Count I, ¶ 24. On January 18, 2002, Freebery allegedly caused J.S. to create a memorandum for the *News Journal* falsely stating that J.S. did not recall conversations with Freebery and suggesting Freebery was not involved in any decision J.S. made regarding the Fieldstone Project. It is further alleged that, on January 29, 2002, Freebery caused J.S. to prepare another memo for the *News Journal* stating: "there was no influence on any decisions [J.S.] made on the Fieldstone application." Indictment, Count I, ¶ 24. Gordon and Freebery then allegedly used outside lawyers retained by the County for a fee in excess of $30,000, to threaten the *News Journal* with a defamation lawsuit if it published a report relating to

6

Freebery's financial relationship with Moseley and Freebery's involvement with the County's review of the project. Indictment, Count I, ¶ 25.

According to the indictment, Freebery filed her 2001 SFI on or about May 1, 2002. In it she did disclose that she had received a "loan" from Moseley. However, she represented that it was "a commercially reasonable loan made in the ordinary course of business," thereby exempting it from the Ethical Code disclosure requirements. Indictment, Count I, ¶ 26.

In addition, the indictment alleges that Freebery, with Gordon's knowledge, caused the County to hire outside lawyers costing over $1,000 to oppose a request under the Freedom of Information Act ("FOIA") for materials relating to Freebery's relationship with Moseley and her involvement with the County's review of the Fieldstone Project. The government claims that, at some point prior to October 9, 2002, Gordon had looked into Freebery's receipt of the money and involvement in the Fieldstone Project review and had concluded that "She shouldn't have done it. It was interference and we're all gonna end up in a . . . jam." Indictment, Count I, ¶¶ 27-28.

Finally, the indictment alleges that Freebery caused the removal of certain specified documents from County property. According to the government, those documents tended to establish the existence of a relationship between Freebery and Moseley and that Freebery had intervened in the review of the Fieldstone Project. Phone messages, including the aforementioned SOS message, were later found in Freebery's home, and the County's file copy of the certificate of occupancy for Fieldstone with

7

G.H.'s note was given to Freebery's attorney. Indictment, Count I, ¶ 29.

Paragraph 1.M of Count I of the indictment sets forth the "Applicable Duties, Laws, Policies, and Procedures" relevant to the defendants' positions as County officials under state and local law, citing several statutes, codes, ordinances, and formally adopted personnel policies. These are discussed in greater detail below, but they include:

- prohibition from taking and exercising control over the County's resources with the intent of appropriating those resources for personal purposes (11 Del C. § 841(a));

- prohibition from using the authority of office for personal or private benefit (68 Del. Laws § 433; NCCC § 2.03.103(A)(1));

- duty to recuse from involvement in matters in which they had a personal or private interest (11 Del. C. § 1211(2); (68 Del. Laws § 433; NCCC § 2.03.103(A)(1), 2.03.104(A));

- with respect to action or nonaction on any matter where the defendant had a personal or private interest and there was no provision for delegation of such responsibility to another person, requirement that the defendant exercise responsibility over the matter only after filing a written statement with the Ethics Commission fully disclosing the interest and explaining why the matter could not be delegated (68 Del. Laws § 433; NCCC § 2.03.103(A)(2)); and

- requirement that Freebery file an SFI publicly disclosing each creditor to whom she owed more than $5,000 (NCCC § 2.03.107).

Count I of the indictment alleges a number of schemes, including the Fieldstone Scheme, and charges conspiracy under the Racketeering Influenced and Corrupt

8

Organizations Act. ("RICO"). Count II, alleging racketeering violations under RICO, is based in part on the Fieldstone Scheme. Counts V, VI, and VII charge Gordon and Freebery with wire fraud and mail fraud in connection with the Fieldstone Scheme. Counts X and XI allege wire fraud and aiding and abetting against Freebery based on her failure to disclose the $2.3 million "loan" on other loan applications. The remaining counts are not related to the Fieldstone Scheme, and they are not at issue in this appeal.

The District Court based its dismissal of the counts arising from the Fieldstone Scheme on the fact that the indictment did not allege, and the government did not contend, that the $2.3 million transfer from Moseley to Freebery "was made for the purpose of influencing her official actions, or that Freebery was in fact influenced by the financial transaction." Dist. Ct. Op. at 9, App. A13. The court was also concerned that the indictment failed to allege that Freebery had a financial interest in the Fieldstone Project. *Id.* The District Court concluded that the government's failure to allege an actual conflict of interest, or that the project should not have been approved, was fatal to the government's attempt to establish criminal culpability based upon that project. *Id.* at 9-10, App. A13-14. Absent those allegations, the court believed that the alleged involvement with the Fieldstone Project was "entirely consistent with the notion that Ms. Freebery was merely providing normal constituent service to a friend of hers" and that "[t]he most that can be said is that Ms. Freebery's involvement possibly gave rise to an appearance of impropriety." *Id.* The District Court concluded that "that is not enough to support a criminal charge." *Id.* at 10, App. A14.

9

With regard to the allegations that Gordon and Freebery used County funds to retain lawyers in order to prevent the local newspaper from disclosing the "scandal in connection with the Fieldstone Project," the court acknowledged that one could conclude that "the defendants' litigation strategies were ill-advised, and Ms. Freebery may well have been motivated, at least in part, by a desire to shield her personal financial arrangements from public discussion." *Id.* However, the District Court concluded that "the defendants were also acting in their official capacities in dealing with the press. The legal fees in question were not incurred solely for the benefit of the defendants." *Id.*

Accordingly, the District Court dismissed the counts based upon the Fieldstone Scheme and the alleged coverup, struck the related allegations from the indictment, and severed the remaining related counts, Counts X and XI, for trial. This appeal followed.[3]

## II. DISCUSSION

The federal mail fraud statute is codified at 18 U.S.C. § 1341, and provides, in relevant part:

> Whoever, having devised or intending to devise any scheme or artifice to defraud . . . deposits or causes to be deposited any matter or thing whatever to be sent or delivered by any private or commercial interstate carrier . . .

---

[3]    We have jurisdiction over an appeal from the District Court's dismissal of an indictment "as to any one or more counts." 18 U.S.C. § 3731. "[D]ismissal of a portion of a count of an indictment [also] is sufficient to establish appellate jurisdiction under § 3731 if the dismissed portion of the count constitutes an independent ground of criminal liability." *United States v. Serafini*, 167 F.3d 812, 814 (3d Cir. 1999).

Our review of the District Court's decision to dismiss counts of the indictment and strike the Fieldstone allegations is plenary. *See United States v. Garcia*, 919 F.2d 881, 885 (3d Cir. 1990).

shall be fined under this title or imprisoned not more than 20 years, or both.

The federal wire fraud statute is codified at 18 U.S.C. § 1343, and provides, in relevant part:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, . . . transmits or causes to be transmitted by means of wire . . . communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both.

"The term 'scheme or artifice to defraud,'" as used in Sections 1341 and 1343, "includes a scheme or artifice to deprive another of the intangible right of honest services." 18 U.S.C. § 1346. Section 1346 was enacted in reaction to the Supreme Court's decision in *McNally v. United States*, 483 U.S. 350, 360 (1987), which held that the prior text of the mail and wire fraud statutes did not include honest services fraud, but was instead "limited in scope to the protection of property rights." Accordingly, "§ 1346 was a clear statement by Congress that it wished to criminalize honest services fraud." *United States v. Murphy*, 323 F.3d 102, 116 (3d Cir. 2002).

The elements of mail or wire fraud are: "(1) the defendant's knowing and willful participation in the scheme or artifice to defraud, (2) with the specific intent to defraud, and (3) the use of the mails or interstate wire communications in furtherance of the scheme." *United States v. Antico*, 275 F.3d 245, 261 (3d Cir. 2001). Honest services fraud typically is found in two situations: "(1) bribery, where a legislator was paid for a particular decision or action; or (2) failure to disclose a conflict of interest resulting in

11

personal gain," which, "[i]n the public sector . . . is oftentimes prescribed by state and local ethics laws."  *Id.* at 262-63.

As we noted at the outset, the District Court was troubled because the instant indictment did not allege, and the government did not contend, that the $2.3 million transfer from Moseley to Freebery "was made for the purpose of influencing her official actions, or that Freebery was in fact influenced by the financial transaction[,]" and because the indictment failed to allege that Freebery had a financial interest in the Fieldstone Project.  Dist. Ct. Op. at 9, App. A13.  Accordingly, the District Court concluded that the allegations based upon the Fieldstone Project were consistent with appropriate constituent service and could not, therefore, support criminal charges.  Dist. Ct. Op. at 9-10, App. A13-14.  However, that ruling is clearly contrary to the law of this circuit.

We rejected a similar argument in *United States v. Antico*, 275 F.3d 245 (3d Cir. 2001).  There, Antico was employed by the Philadelphia Department of Licenses and Inspections ("L&I").  The government alleged that in order to avoid paying child support payments to Elizabeth Riccardi, Antico gave her a position as an "expediter."[4]  He then referred Riccardi clients, aided her in filling out L&I applications or completed them

---

[4]  As described in *Antico*, "[e]xpediters are independent contractors who, in exchange for a fee, represent businesses and individuals before L&I and the Zoning Board of Adjustment ("ZBA").  Expediters typically prepare the paperwork required to obtain permits, licenses, or variances by L&I or the ZBA.  Expediters may interact with employees of L&I during the process, and appear at public hearings before the ZBA." *Antico*, 275 F.3d at 252.

12

himself, allowed her to use his office, and even had city employees pick up and deliver her paperwork and watch her children. He never publicly disclosed any conflict of interest or disqualified himself from taking any official action in any L&I matter involving her.

We affirmed Antico's conviction for honest services fraud. In doing so, we accepted "[t]he government's prosecutorial theory [that] . . . by failing to disclose his personal interest in a matter over which he had discretionary decision-making authority," Antico committed honest services fraud by "depriv[ing] the public of its right to disinterested decision-making and of its right to full disclosure of his personal motivation." *Antico*, 275 F.3d at 262. Antico had a duty to disclose information pertaining to a conflict of interest under state and local law, and his failure to do so constituted honest services fraud. *Id.* We explained the violation of his duty as follows:

> Duties to disclose material information affecting an official's impartial decision-making and to recuse himself exist within th[e] fiduciary relationship [between a public servant charged with disinterested decision-making and the public he serves] regardless of a state or local law codifying a conflict of interest. . . .[5] In the context of honest services fraud, where undisclosed, biased decision making for personal gain, whether or not tangible loss to the public is shown, constitutes a deprivation of honest services, an active fraud or deceit is not necessary. . . . *[T]he prosecution need prove only a*

_____

[5] Although this language suggests that honest services fraud does not require a violation of underlying "state or local law codifying a conflict of interest," Antico was charged with violations of law and this portion of our discussion was therefore *dicta*. *See Murphy*, 323 F.3d at 117; *United States v. Panarella*, 277 F.3d 678, 699 n.9 (3d Cir. 2002).

13

> *recognizable scheme formed with intent to defraud regardless of how that intent manifests itself in execution. . . .* The legal meaning of fraud is not limited to deceit or misrepresentation; it includes overreaching, undue influence, and other forms of misconduct. *Nor is a showing of public harm required.*

*Id.* at 264 (internal citations and quotation marks omitted, emphasis added). Accordingly, we rejected Antico's argument that "'absent deceit, concealment, demonstrable public harm or other active fraud,' his conviction . . . cannot stand." *Id*. at 264. We concluded that "[A]n official's intentional violation of the duty to disclose provides the requisite 'deceit.'" *Id.* (quoting *United States v. Sawyer*, 85 F.3d 713, 732 (1st Cir. 1996) (brackets in original). In reaching our conclusion, we cited *United States v. Woodward*, 149 F.3d 46, 63 (1st Cir. 1998) (omission in original), wherein the court stated that "[the defendant's] intent is . . . demonstrated by his failure to disclose his conflict of interest although he was required to do so."

We again made this clear in *United States v. Panarella*, 277 F.3d 678 (3d Cir. 2002). Panarella was convicted for being an accessory to honest services fraud based upon payments he made to a state senator, Loeper, who failed to disclose those payments while taking actions in the state senate that directly benefitted Panarella's delinquent tax collection business. We had to decide "whether allegations that Loeper unlawfully concealed [that] income . . . while taking discretionary action that Loeper knew would directly benefit Panarella amount[ed] to a scheme to deprive the public of his honest services, or whether an additional allegation that Loeper's discretionary action was influenced by Panarella's payments [was] necessary." *Id*. at 691. We concluded that no

14

additional allegation was needed.  We held: "where a public official takes discretionary action that the official knows will directly benefit a financial interest that the official has concealed in violation of a state criminal law, that official has deprived the public of his honest services under 18 U.S.C. § 1346." *Id.*

In reaching that holding, we rejected Panarella's reliance on *United States v. Bloom*, 149 F.3d. 649 (7th Cir. 1998).  There, the court had reversed the conviction of a Chicago alderman who had given advice as a private attorney.  The court in *Bloom* held that honest services fraud required misuse of one's official position "for personal gain." *Panarella*, 277 F.3d at 692.  We distinguished *Bloom*, and rejected its reasoning.  The *Bloom* analysis is analogous to the District Court's concern that the instant indictment did not allege personal gain.  *Panarella* establishes that an allegation of personal gain is not necessary to establish honest services fraud.  Rather, "state law offers a better limiting principle for purposes of determining when an official's failure to disclose a conflict of interest amounts to honest services fraud." *Id*.  Accordingly, we specifically refused to limit the offense to situations in which  a public official uses his or her office for personal gain.  *Id*. at 694 ("Rather than limiting honest services fraud to misuse of office for personal gain, we hold that a public official who conceals a financial interest in violation of state criminal law while taking discretionary action that the official knows will directly benefit that interest commits honest services fraud.") (citing *Woodward*, 149 F.3d at 62).

We again addressed the scope of honest services fraud in *United States v. Murphy,* 323 F.3d 102 (3d Cir. 2003).  There, the defendant was not a public official, but the

15

former chairman of a county political party who was convicted of honest services fraud. The predicate offense for that conviction was a violation of a state bribery statute, N.J.S.A. 2C:27-2(a). We rejected the government's theory that Murphy had become so involved in county government "that he could be considered the equivalent of a publicly elected official." *Id*. at 104. We also rejected the contention that Murphy had a fiduciary relationship with the public. In the District Court, the government had relied upon *United States v. Margiotta*, 688 F.2d 102 (2d Cir. 1982), in an attempt to stretch the offense of honest services fraud to a private citizen who was not a public employee or elected official. In *Margiotta*, the Court of Appeals for the Second Circuit had sustained an honest services mail fraud conviction of the chairman of a county political party under circumstances very similar to the facts surrounding Murphy's conviction. However, we rejected the rationale of *Margiotta* because it extended the mail fraud statute "beyond any reasonable bounds." *Murphy*, 323 F.3d at 104. We explained that, "[w]ithout the anchor of a fiduciary relationship established by state or federal law, it was improper for the District Court to allow the jury to create one." *Id*.

We also explained that the *Margiotta* approach was inconsistent with principles of federalism that are preserved when federal honest services fraud is tied to a violation of a fiduciary relationship arising under state or local law. *Id*. at 117. Violation of the bribery statute at issue in *Margiotta* did not, by itself, establish the required fiduciary relationship. Rather, we reiterated our statement in *Panarella* that the fraud or deceit endemic in honest services fraud may arise from "the deliberate concealment of material information

16

in a setting of fiduciary obligation." *Id*. (quoting *Panarella*, 277 F.3d at 695 and *United States v. Holzer*, 816 F.2d 304, 307 (7th Cir. 1987)).[6]

Thus, although a violation of a state criminal law may be sufficient to lay the foundation for honest services fraud, it is clear from our analysis of the requisite fiduciary duty that honest services fraud does not require a violation of *criminal* law, but rather a violation of a state-created fiduciary duty. At the very least, the government must allege a violation of some law – or a recognized fiduciary duty – to adequately charge honest services fraud. Once again, we are here not required to delineate the parameters of the standard beyond this holding because here the government has alleged that Freebery and Gordon violated Delaware laws.

## A. The Instant Indictment Adequately Alleged Honest Services Fraud.

"An indictment is generally deemed sufficient if it: 1) contains the elements of the offense intended to be charged, 2) sufficiently apprises the defendant of what he must be prepared to meet, and 3) allows the defendant to show with accuracy to what extent he may plead a former acquittal or conviction in the event of a subsequent prosecution." *United States v. Rankin*, 870 F.2d 109, 112 (3d Cir. 1989) (internal citations and

---

[6] In deciding *Murphy*, we also endorsed the reasoning of the Court of Appeals for the Fifth Circuit in *United States v. Brumley*, 116 F.3d 728 (5th Cir. 1997). There, the court interpreted § 1346 as requiring a state law limiting principle for honest services fraud. *Murphy*, 323 F.3d at 116 & n.5. The court in *Brumley* stated that an official who does all that is required under state law but who is alleged to have not discharged his or her duties "honestly" cannot be convicted of honest services fraud. *Brumley*, 116 F.3d at 734. Rather, § 1346 "contemplates that there must first be a breach of a state-owed duty." *Id.*

17

punctuation omitted). "[N]o greater specificity than the statutory language is required so long as there is sufficient factual orientation to permit the defendant to prepare his defense and to invoke double jeopardy in the event of a subsequent prosecution." *Id.* In evaluating the sufficiency of the indictment, we must assume the truth of the facts alleged. *See Panarella*, 277 F.3d at 681. We also consider the entire body of the charging instrument in determining whether the crimes charged are sufficiently alleged. *Id.* at 690 n.7.

As stated above, the elements of mail or wire fraud are: "(1) the defendant's knowing and willful participation in the scheme or artifice to defraud, [which includes honest services fraud] (2) with the specific intent to defraud, and (3) the use of the mails or interstate wire communications in furtherance of the scheme." *Antico*, 275 F.3d at 261. Honest services fraud may be found where a public official fails to disclose a conflict of interest in violation of law. *See Panarella*, 277 F.3d at 694; *Antico*, 275 F.3d at 263.

Paragraph 1.M of Count I of the indictment sets forth the "Personal Duties and Prohibitions" applicable to Freebery and Gordon under state and local law as follows:

> I. By virtue of their positions as County officials and employees, each owed a fiduciary duty and a duty of honest services to New Castle County and its citizens.
> ii. Pursuant to Delaware law and New Castle County personnel policies, County officials and employees were prohibited from taking and exercising control over the County's resources with the intent of appropriating those resources for personal purposes and thereby depriving the County and its citizens of the County's resources, including the services of County employees, supplies, materials, equipment, and other property.

(11 Del. C. § 841(a);[7] County Personnel Policy 1.00.18[8])

        iii.     Pursuant to Delaware law and the New Castle County Code, County officials and employees were prohibited from using the authority of their offices for their personal or private benefit. (68 Del. Laws c. 433,[9] § 1; NCCC § 2.03.103(A)(1)[10])

---

[7] Section 841(a) of Title 11 of the Delaware Code states "a person is guilty of theft when the person takes, exercises control over or obtains property of another person, intending to deprive that person of it or appropriate it."

[8] No copy of the Personnel Policy has been provided. However, the indictment states:

> Pursuant to Delaware law, the County Executive was entrusted with the executive and administrative responsibilities of the County. Pursuant to Delaware law, the CAO was entrusted with and responsible for the general supervision over the executive and administrative agencies of the County, subject to the policies and directives of the County Executive. The CAO was required under Delaware law to prepare on behalf of the County Executive the County's annual budget, capital program, and capital budget; supervise the execution of the County's budgets; and prepare reports and information concerning the status of the County's financial and other affairs.

Indictment, Count I, ¶ 1.B.

[9] 68 Del. Laws c. 433 is included as part of 29 Del. C. § 5802(4). As per the Assistant United States Attorney's letter to the Court, dated May 15, 2006, it can also be found on Westlaw at DE LEGIS 433 (1992) in the DE-LEGIS-OLD database. This provision states that all counties, municipalities, and towns should adopt code of conduct legislation applicable to their employees and officials that is at least as stringent as that adopted under Delaware law.

[10] Section 2.03.103(A) of the New Castle County Code ("NCCC") restricts the exercise of official authority as follows, in relevant part:

> 1.     No County employee or County official shall use the authority of his or her office or employment . . . for the personal or private benefit of himself or herself, a member of his or her immediate family or a business with which he or she is associated. . . .
>
> 2.     In any case where a person has a legal and/or statutory responsibility with respect to any action or nonaction on any matter where the person has a personal or private interest and there is no provision for the delegation of such responsibility to another person, the person may exercise responsibility

19

iv.     Pursuant to Delaware law and the New Castle County Code, County officials and employees were required to recuse themselves from involvement in matters in which they had a personal or private interest. (11 Del. C. § 1211(2);[11] 68 Del. Laws c 433, § 1; NCCC §§ 2.03.103(A)(1), 2.03.104(A)[12])

v.      Pursuant to Delaware law and the New Castle County Code, if a County official or employee had a legal and/or statutory responsibility with respect to action or nonaction on any matter where he or she had a personal or private interest and there was no provision for the delegation of such responsibility to another person, the County official or employee could exercise responsibility with respect to such matter only if he or she filed a written statement with the County Ethics Commission fully disclosing the personal or private interest and explaining why it was not possible to delegate responsibility for the matter to another person.  (68 Del. Laws c. 433, § 1; NCCC § 2.03.103(A)(2))

vi.     Pursuant to Delaware law and the New Castle County Code, Defendant Sherry L. Freebery was required to file for each year on or before May 1 of the succeeding year a Statement of Financial Interests

with respect to such matter, provided that promptly after becoming aware of such conflict of interest, the person files a written statement with the Commission fully disclosing the personal or private interest and explaining why it is not possible to delegate responsibility for the matter to another person. . . .

Supp. App. SA24-25.

[11]  Section 1211(2) states "a public servant is guilty of official misconduct when, intending to obtain a personal benefit or to cause harm to another person . . . the public servant knowingly refrains from performing a duty which is imposed by law or is clearly inherent in the nature of the office."

[12]  Section 2.03.104 of the NCCC sets forth the Code of Conduct, which prohibits County employees from: engaging in conduct which, while not rising to a violation of Section 2.03.103(A)(1), undermines public confidence in the impartiality of a governmental body; acquiring a financial interest in any private enterprise which the employee has reason to believe will be directly involved in a decision to be made by that employee in an official capacity; failing to disclose a financial interest in a private enterprise subject to County regulation or doing business with the County; using his office to secure privileges, advancement, or gain; engage in outside activities which might lead to disclosure of confidential information; disclosing confidential information or use it for personal benefit; using sexual favors for favorable treatment.  Supp. App. SA26-27.

20

("SFI") disclosing to the public, among other things, each creditor to whom she owed a debt in excess of five thousand dollars. (68 Del. Laws c. 433, § 1; NCCC §§ 2.03.106,[13] 2.03.107[14])

***

xiii.    Pursuant to Delaware law, County officials and employees were required, subject to certain exceptions, to make available for public copying and inspection documents relating to public business, public purposes, or public interest. (29 Del. C. § 10001 et seq.)

Indictment, Count I, ¶ 1.M.  Paragraph 1 of Count I is incorporated by reference into Counts II through VIII.

### 1. Sufficiency of the Charges Against Freebery.

The indictment sets forth the schemes in which the defendants allegedly participated, including the Fieldstone Scheme, the defendants' "Objectives" (*i.e.*, misuse of the County and its resources for their personal benefit and enrichment, participation in matters in which they had conflicts of interest, failure to disclose conflicts of interest, use of County resources to conceal conflicts of interest, and intimidation of County employees to force compliance with unethical or unlawful orders), and the defendants' official duties and responsibilities under state and local law.  The charging language is in

---

[13] Section 2.03.106 of the NCCC requires designated County officials to file statements of financial interest ("SFIs") each year.  Supp. App. SA27-28.

[14] Section 2.03.107 of the NCCC requires that the SFI include "the name and address of each creditor to whom a debt is or was owed by the person or business with which he or she is associated in excess of five thousand dollars ($5,000).  However, loans or credit extended between members of the immediate family and mortgages securing real property extended by a financial institution in the ordinary course of business which is the principal or secondary residence of the person filing need not be included."  Supp. App. SA28-29.

21

separate paragraphs within each count and mirrors the applicable federal statute.

Although the District Court was troubled by the absence of an allegation of an actual conflict of interest or personal financial interest in the Fieldstone Project, we have explained that neither is required. *See Antico*, 275 F.3d at 264.

The indictment clearly alleges the required violation of a fiduciary duty and deceit by averring Freebery's knowing and willful participation in the Fieldstone Scheme in the context of the alleged honest services fraud.[15] *See* Indictment, Count I, ¶¶ 19-29. Each of these counts alleges that in furtherance of the Fieldstone Scheme and for the purpose of its execution, Freebery caused either a mail or a wire communication. Indictment, Count II, ¶ 7; Counts V-VII. Given the specificity of the alleged conduct and the clear statement of the laws and ordinances the conduct purportedly violated, it is difficult to understand how the District Court could have concluded that the charges arising from the purported Fieldstone Scheme were not adequately alleged in the indictment. The indictment clearly informs the defendants of the conduct upon which the government bases its criminal charges, and it clearly sets forth the duties that the alleged conduct violated as well as the statutory origin of those duties. We do not know what more the government should have done, given the nature of the alleged fraud. The allegations are more than adequate to

---

[15] As we noted above, *Panarella* explains the required intent to defraud for purposes of honest services fraud. In that context, "[f]raud in its elementary common law sense of deceit . . . includes the deliberate concealment of material information in a setting of fiduciary obligation." *Panarella*, 277 F.3d. at 696 (quoting *United States v. Holzer,* 816 F.2d 304, 307 (7th Cir. 1987), *vacated and remanded for consideration in light of McNally*, 484 U.S. 807 (1987)).

22

allow Freebery to prepare her defense and protect herself against double jeopardy. *See*

*Rankin*, 870 F.2d at 112.

As CAO, Freebery had general supervisory authority over all County business. The indictment alleges that she "caused" the permanent certificate of occupancy to be issued on the Fieldstone Project. The indictment spells out the conduct that the government will attempt to prove to establish that contention, *e.g.*, G.H.'s note written on the county copy provided to Freebery, stating "Chief, We Deliver, [G.]." The indictment contains allegations that the loans made by Moseley to both Duffy and Freebery were payable on demand. Even though it is not alleged that Freebery had a financial interest in the Fieldstone Project itself, a reasonable jury could certainly conclude that the possibility that a $2.3 million loan could be called at any time affected Freebery's exercise of her official discretion. Given the demand nature of the $2.3 million note, a jury could find that Freebery had every reason to do whatever she could to please Moseley so that the loan evidenced by the note would never be called and would therefore actually become a gift. Although Freebery may not have had direct authority over the actual approval of the certificate needed for the Fieldstone Project, it certainly appears from the indictment that she had administrative authority over those who were reviewing and approving applications such as Moseley's. At the very least, the government has properly laid the legal foundation to attempt to prove the scope of Freebery's authority at trial. Accordingly, the indictment clearly alleges that Freebery had a conflict of interest that should have been disclosed. *See Panarella*, 277 F.3d at 698. Whether or not she acted

23

with the requisite intent under the statute is a matter for a jury to decide. *See United States v. Voigt*, 89 F.3d 1050, 1090 (3d Cir. 1996). It cannot be determined by a court confronted with motions to dismiss. *See id.*

Thus, at this stage of the proceedings, we find no merit in Freebery's arguments that she was not required to disclose the $400,000 she received from Duffy shortly after he had received $500,000 from Moseley; that she reasonably believed that the $2.3 million loan from Moseley was "a commercially reasonable loan made in the ordinary course of business;" that any misrepresentation she made was not material; that she had no legal authority with regard to the Fieldstone Project or any duty to recuse herself from involvement with it; and that the indictment failed to advance the theory that Freebery failed to disclose any conflict of interest and instead only alleged that she failed to recuse herself and/or took action on behalf of Moseley. We also reject Freebery's argument that holding that the government has sufficiently pleaded honest services fraud here will criminalize constituent service. The issue here is not whether Freebery's efforts on behalf of the Fieldstone Project can be viewed as ordinary constituent service as she argues, and as the District Court found. Rather, the issue is whether the indictment is sufficient to allow the government to attempt to prove that her failure to disclose her relationship with Freebery, in violation of Delaware law and under the circumstances alleged, constitutes honest services fraud. We hold that the indictment is sufficient as a matter of law. Issues of proof are not before us. They will ultimately have to be resolved by the trial court. *See Voigt*, 89 F.3d at 1090.

24

## 2. Sufficiency of the Allegations Pertaining to Gordon.

Gordon's challenge to the indictment is a much closer call than Freebery's. Both Freebery and Gordon are charged in Count I with RICO conspiracy in violation of 18 U.S.C. § 1962(d), in Count II with RICO activities including mail and wire fraud in violation of § 1962(c), and, among other things, in Counts V, VI, and VII with violations of 18 U.S.C. § 2, which prohibits aiding and abetting. As stated above, for the purposes of determining the sufficiency of the indictment, we must take the facts alleged therein as true. *Panarella*, 277 F.3d at 681.

The indictment alleges that by the time Freebery caused the County to hire attorneys to oppose the FOIA request regarding her relationship with Moseley and her involvement with the county's review of the Fieldstone Project, Gordon had already looked into the matter and had concluded that: "She shouldn't have done it. It was interference and we're all gonna end up in a . . . jam." Indictment, Count I, ¶ 28. The indictment does not allege that Gordon had a personal or private interest in the Fieldstone Scheme or that he benefitted from either his participation in the scheme or from the County's approval of the Fieldstone Project. Nor are there allegations that Gordon received anything of value. However, as explained above, that is not fatal to the legal sufficiency of these charges.

Gordon claims he had no contemporaneous knowledge of Freebery's allegedly illegal activities and the overarching scheme. However the government alleges that he did. The indictment avers that Gordon and Freebery began devising the scheme, and

25

intended to devise the Fieldstone Scheme "no later than October 2000." Indictment, Count I, ¶ 19.[16] Moreover, Gordon is alleged to have participated in directing a County employee to remove documents from County files in a cover-up effort on January 10, 2002. Indictment, Count I, ¶ 24. The indictment also alleges Gordon participated in hiring outside lawyers to help Freebery avoid filing her SFI and to threaten a defamation lawsuit against the local newspaper for publishing a story about Freebery's relationship with Moseley. Indictment, Count I, ¶¶ 23, 25. Thus, Gordon's contention that the indictment fails to allege any illegal activity on his part prior to Freebery's filing of the second SFI in May, 2002, which, he contends, ended the illegal activity with regard to the Fieldstone Scheme, is incorrect. Factual disputes regarding what Gordon knew and when he knew it must be resolved by a jury and are not appropriately resolved by the court on a motion to dismiss. *See Voigt*, 89 F.3d at 1090.

## IV. Conclusion

Accordingly, we will reverse the decision of the District Court to dismiss the portions of the indictment referring to the Fieldstone Scheme and the related charges and remand for proceedings in accordance with this opinion.

---

[16] The heading of the section of the indictment of which Paragraph 19 is a part is entitled "Gordon and Freebery Use County Resources In Efforts To Avoid Disclosure of Freebery's Financial Relationship With L.D.M. In Freebery's SFI For 2001."